# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____
                                         )
PAUL LOHMANN, *et al.*,                   )
                                         )
                    Plaintiffs,           )
                                         )
          v.                             )          No. 19-cv-994C
                                         )
THE UNITED STATES,                       )          Filed: June 29, 2021
                                         )
                    Defendant.            )
_____ )

## OPINION AND ORDER

Before the Court are Plaintiffs' Motion for Class Certification and Appointment of Class Counsel (ECF No. 13) and Amended Motion for Class Certification and Appointment of Class Counsel (ECF No. 27), as well as Defendant's alternative request to stay the administration of any class until a dispositive ruling in this matter (ECF No. 29). For the reasons that follow, Plaintiffs' motions are **DENIED** and Defendant's alternative request is **DENIED AS MOOT**.

## I. BACKGROUND

### A. Plaintiffs' Claims

Named Plaintiffs are ten reserve component ("RC") soldiers who were temporarily mobilized from the RC to active duty and assigned to Fort Hood, Texas, for multiple temporary tours of duty between fiscal years ("FYs") 2014 and 2017. Pls.' Compl. at ¶¶ 1–2, ECF No. 1. Plaintiffs allege that they were released from active duty and ordered to return to their homes of record ("HOR") at the conclusion of each temporary duty assignment. *Id.* ¶ 4. Each served on Temporary Change of Station ("TCS") orders that authorized per diem at a rate of 55% of the locality rate, pursuant to paragraph 4950 of the Joint Travel Regulations ("JTR") dated October 1, 2014 and paragraph 4250(A)(1)(b) of subsequent JTRs dated November 1, 2014 through April 1,

2017. *Id.* ¶¶ 5–6. Some of the Plaintiffs served on Permanent Change of Station ("PCS") orders at Fort Hood immediately before their TCS tour(s) began. *Id.* ¶ 3.[1]

Plaintiffs claim that while at their TCS location, they were all required to live off of the installation due to the unavailability of government-provided housing, ultimately requiring Plaintiffs to maintain two households—*i.e.*, their primary/permanent residence at their HOR and their off-installation housing at Fort Hood. *See id.* ¶ 45. Despite devoting time and money to accommodating off-installation housing, with an authorization to receive a 55% per diem allowance, Plaintiffs allege they were wrongly denied per diem payments for FYs 2015 through 2017. *Id.* ¶ 30. They further allege that the Army based these denials on an erroneous rule requiring a multi-day break in service between PCS and TCS duty assignments. *Id.* ¶¶ 8–9. This rule resulted from a 2015 U.S. Army Audit Agency report that investigated the circumstances surrounding the potentially unauthorized payment of TCS entitlements to 146 First Army soldiers. *See Mobilized Soldiers on [TCS] Orders*: Audit Report A-2015-0087-FMX ("2015 Audit Report") at 32, ECF No. 38-1. According to Plaintiffs, the 2015 Audit Report rule contravened the applicable JTRs, which required a minimum break in service of only one day. ECF No. 1 ¶¶ 29–30.

Plaintiffs allege that the injury caused by the Army's application of this erroneous rule extended beyond their individual claims. According to Plaintiffs, as of July 2016, there were 405 RC soldiers assigned to long-term temporary duty at Fort Hood and more than 1,000 additional RC soldiers assigned to long-term temporary duty at other locations throughout the Continental

---

[1] Facts pertaining to each Plaintiff's individual orders are alleged at paragraphs 55 through 183 of the Complaint. *See* ECF No. 1. Details regarding each Plaintiff's orders are also summarized in the decisions of the Army Board for Correction of Military Records. *See infra* n.3.

United States. *Id.* ¶ 46. Plaintiffs believe most of these Reservists were denied per diem for FYs 2015 through 2017 based on the 2015 Audit Report rule. *Id.*

Prior to initiating this suit, Plaintiffs attempted for several years to press their claims for per diem both within and outside the Army. *Id.* ¶ 49. Plaintiffs claim that they repeatedly inquired about the alleged payment error to Army officials and contacted several members of Congress for assistance. *See id.* ¶¶ 10–11, 16–17, 194. They assert that "these inquiries reached the Army's Deputy Chief of Staff for Manpower and Personnel Plans, Programs, and Policies (Army G-1) office at the Pentagon[;]" however, the Army never issued a final decision on the matter. *Id.* ¶ 194. From October 2016 through mid-2017, Plaintiff Lohmann on behalf of all Plaintiffs submitted several congressional inquiries and an Article 138 Complaint to no avail. *Id.* ¶ 70. Finally, in March 2018, Plaintiffs sent a letter through counsel to the Office of the Secretary of the Army requesting per diem payments or a statutory or regulatory basis for the denial of their payments. *Id.* ¶ 18. The Army provided an interim response in April 2018, indicating that it would provide a decision or further correspondence by June 2018. *Id.* ¶ 19. By July 2019, after Plaintiffs provided documentation requested by the Army to evaluate their cases and after numerous exchanges of correspondence, the Army had not issued a decision. *Id.* ¶¶ 20–23.

On July 11, 2019, Plaintiffs filed the instant action on behalf of themselves and a proposed class of similarly situated RC soldiers. Plaintiffs' Complaint seeks back pay for the per diem entitlements that the Army allegedly owes Plaintiffs and the proposed class under 37 U.S.C. § 474(a)(4) (Travel and Transportation Allowances) and the JTRs. *See* ECF No. 1 ¶ 27; *see also id.* at 28 ("Prayer for Relief"). Additionally, Plaintiffs seek pre-judgment and post-judgment interest, costs, and attorneys' fees, as well as an incentive payment to compensate Plaintiffs for their efforts and participation in the proposed class action. *Id.* at 28 ("Prayer for Relief").

**B. Intervening Actions Providing Partial Relief on Plaintiffs' Claims**

One week later, on July 18, 2019, the Principal Deputy Assistant Secretary of the Army for Manpower and Reserve Affairs ("PDASA") sent a letter to Plaintiffs' counsel responding to counsel's March 2018 letter. *See* Pls.' Mot. for Class Certification & Appointment of Class Counsel, Ex. A (Letter from Principal Deputy Assistant Sec'y Marshall M. Williams to Michael E. Silverman (July 18, 2019)), ECF No. 13-1. The PDASA determined, after reviewing Plaintiffs' materials, that Plaintiffs are authorized to per diem entitlements for their active duty periods in FYs 2016 and 2017. *Id.* at 1–2. He requested that Plaintiffs submit supporting documentation to Army Headquarters to initiate the processing of those per diem payments. *Id.* at 2. The PDASA further determined that Plaintiffs are not authorized per diem entitlements for their active duty period in FY 2015 because Plaintiffs' TCS orders were retroactively amended several weeks after they were released from active duty under their PCS orders to create a two-day break in service between their then-current TCS orders and previous PCS orders. *Id.* at 1. The PDASA noted that the JTR prohibits changing a permanent duty station once travel is complete and also prohibits retroactively modifying orders to create or change a per diem allowance. *Id.*; *see, e.g.*, JTR ¶ 4950(A)(4) (Oct. 1, 2014), ECF No. 38-1 at 6. Since Plaintiffs were already residing at Fort Hood on PCS orders and did not have a break in service between their PCS and TCS orders (as those TCS orders were originally drafted), the PDASA found they are not entitled to per diem for FY 2015. *See* ECF No. 13-1 at 1. Additionally, he found the retroactive amendment of Plaintiffs' orders to be contrary to the JTR. *Id.*

On March 9, 2020, Defendant moved pursuant to Rule 52.2(a) of the Rules of the United States Court of Federal Claims ("RCFC") for an order remanding this matter to the Secretary of the Army with instructions to submit Plaintiffs' claims to the Army Board for Correction of

Military Records ("ABCMR" or "the Board") and staying further proceedings pending the remand decisions.[2]  *See* Def.'s Mot. for Voluntary Remand and a Stay of Ct. Proceedings at 1, ECF No. 12.  Defendant argued that the "interests of efficiency and justice" weighed in favor of giving the Army the opportunity to address Plaintiffs' claims in the first instance.  *Id.* at 3.  Plaintiffs disagreed.  They objected to remand on the grounds that it would unduly delay resolution of Plaintiffs' and the proposed class's claims.  *See* Pls.' Resp. to Def's Mot. for Voluntary Remand and for a Stay of Ct. Proceedings at 6–10, ECF No. 14.  Despite Plaintiffs' opposition, on March 26, 2020, the court entered an order staying proceedings and remanding the case to the ABCMR. *See* Order (Smith, J.), ECF No. 16.  The court was persuaded by Defendant's argument that the ABCMR's decisions could provide complete relief to Plaintiffs or, at the very least, limit the issues before the court.  *Id.* at 1.  In addition, the court noted that potential future class members would not be prejudiced by a remand because, in the event the ABCMR provided complete or partial relief to Plaintiffs, Defendant committed to notifying similarly situated Army soldiers that they might be entitled to compensation.  *Id.* at 2 (quoting ECF No. 12 at 5).

In November 2020, the ABCMR issued decisions in Plaintiffs' remand proceedings.  *See* Joint Status Report, ECF No. 22.[3]  In each case, the Board agreed with the PDASA's decision, finding Plaintiffs are entitled to per diem payments for FYs 2016 and 2017 but are not entitled to per diem payments for FY 2015 due to the JTR's requirement that there be a break in service of at

---

[2] The docket reflects little activity in the litigation between the filing of the Complaint and Defendant's remand motion, other than a series of requests to extend the deadline for Defendant's response to Plaintiffs' Complaint.

[3] The parties attached to the status report a copy of each Plaintiff's ABCMR decision.  *See* Lohmann Decision, ECF No. 22-1; Valdez Decision, ECF No. 22-2; Carpenter Decision, ECF No. 22-3; Vaughn Decision, ECF No. 22-4; Fields Decision, ECF No. 22-5; Williford Decision, ECF No. 22-6; Samuel Decision, ECF No. 22-7; Patrick Decision, ECF No. 22-8; Lopez Decision, ECF No. 22-9; and Villegas Decision, ECF No. 22-10.

least one day.  *See, e.g.*, Lohmann Decision at 15–16, ECF No. 22-1.  With respect to FY 2015, the ABCMR found that the retroactive amendment of Plaintiffs' orders "to create a false break in service" was "extraordinary" and violated the JTR's prohibition on retroactive revocation and/or modification of orders.  *Id.*  The Board recommended correcting each Plaintiff's military records to show eligibility for per diem entitlements for FYs 2016 and 2017 and paying Plaintiffs per diem based on this correction, less payments Plaintiffs already received, if any, as authorized by the PDASA's letter.  *Id.* at 17.  The ABCMR recommended denial of any other relief.  *Id.*

It appears, at least in the case of Plaintiff Lopez, that the Office of the Secretary of the Army has since acted on the ABCMR's recommendation and corrected Plaintiffs' records.  *See* Pls.' Reply Br. in Support of Mot. for Class Certification & Appointment of Class Counsel at 24 (Letter from Def. Fin. & Acct. Agency to Miguel A. Lopez (Jan. 7, 2021) (attached as Ex. A)), ECF No. 30.  As a result, the Defense Finance and Accounting Agency ("DFAS") has provided instructions to initiate the process of calculating and issuing per diem payments for FYs 2016 and 2017.  *Id.*

## C.     Plaintiffs' Request for Class Certification

On March 11, 2020, shortly after Defendant moved for a remand, Plaintiffs filed their Motion for Class Certification and Appointment of Class Counsel.  *See* ECF No. 13.  Plaintiffs' motion sought certification of three subclasses of similarly situated RC soldiers, including:

> •      Subclass A: Consisting of certain RC soldiers who served a PCS tour of duty during FYs 2013 and/or 2014 whose orders instructed the soldier to return to his or her HOR and be "released from active duty" upon arrival.  Each of these soldiers was released from active duty and traveled to his or her HOR at the conclusion of FY 2014.  Each was subsequently ordered to return to active duty at Fort Hood on TDY orders for FYs 2015 and/or 2016 and was authorized per diem at the 55% rate.  Each soldier requested per diem for FYs 2015 and/or 2016 in accordance with the JTR, and it was denied by the Army.

- Subclass B: Consisting of RC soldiers who never served on PCS tours but instead served multiple TDY tours at the same duty location during FYs 2014 through 2017 and whose TDY orders authorized per diem at the 55% rate. Each of these soldiers was released from active duty and traveled to his or her HOR at the conclusion of each tour. Each soldier requested per diem for each tour in accordance with the JTR, and it was denied by the Army.

- Subclass C: Consisting of certain RC soldiers similarly situated to the members of subclasses A or B who were paid per diem at the 55% rate and had their payments wrongly recouped by the Army.

*Id.* at 12–13. Further briefing on Plaintiffs' motion was stayed, along with all other proceedings, during the remand period.

On December 30, 2020, following the ABCMR's remand decisions, Plaintiffs filed an Amended Motion for Class Certification and Appointment of Class Counsel, renewing their request that the Court certify the proposed subclasses.[4] *See* Pls.' Am. Mot. for Class Certification & Appointment of Class Counsel, ECF No. 27. As in the original motion, Plaintiffs argue that they satisfy the class certification standards set forth in RCFC 23(a) and (b). *Id.* at 8–16. Specifically, they claim that the proposed class likely includes hundreds, if not thousands, of RC soldiers dispersed across the Continental United States, thus satisfying the numerosity requirement. *Id.* at 8–9. Plaintiffs contend that there are common questions of law and fact because they and the proposed class served on similar types of mobilization orders and were wrongly denied per diem payments by the Army in contravention of the JTR. *Id.* at 10–11. For similar reasons, Plaintiffs contend that their claims are typical of the proposed class. *Id.* at 12.

---

[4] Notably, in the amended motion, Plaintiffs modified the definition of subclass A, expanding it to RC soldiers "subsequently ordered back to active duty on TDY orders for FY 2015 and/or FY 2016," ECF No. 27 at 5, without limitation to a particular duty location. *Compare id. with* ECF No. 13 at 4 (limiting subclass A to RC soldiers "subsequently ordered back *to Fort Hood* on TDY orders for FY 2015 and/or FY 2016") (emphasis added). The Court presumes that the correction was intentional, as it aligns the definition with the grounds for certification alleged in Plaintiffs' Complaint and certification motions. *See, e.g.*, ECF No. 1 ¶ 46. Accordingly, this opinion addresses Plaintiffs' request to certify a proposed class as defined in the amended motion.

They allege the adequacy requirement is also met, citing to declarations describing the qualifications and experience of their counsel and noting the lack of any conflicts of interest between Plaintiffs and the proposed class. *Id.* at 13–14. Finally, Plaintiffs argue that a class action is the superior method for resolving the proposed class's claims because class members likely would not bring separate actions and because managing the proposed class would not be particularly difficult. *Id.* at 14–16. *See also generally* ECF No. 30.

In its opposition, Defendant argues that the scope of any class certified by the Court should be limited to what remains of the case after remand. *See* Def.'s Resp. to Pls.' Mot. to Certify Class, Or In the Alt., Mot. to Stay the Admin. of Any Class Until the Ct. Rules on the Parties' Cross-Mot. for J. on the Admin. R. at 5, ECF No. 29. In Defendant's view, the ABCMR provided complete relief to Plaintiffs on their claims related to FYs 2016 and 2017 ("FY 2016/2017 claims") and, as such, those claims are moot and cannot proceed on a class basis. *Id.* at 6–9. Defendant asserts that the remaining FY 2015 claim does not satisfy all the requirements of RCFC 23. *Id.* at 11–16. Specifically, Defendant argues that Plaintiffs are merely speculating about the number of RC soldiers whose per diem allowances were similarly denied. *Id.* at 11–12. It further claims that commonality and typicality are not present because determining each proposed class member's entitlement to per diem would require an individualized determination of his or her specific circumstances. *Id.* at 12–14. Finally, Defendant claims that Plaintiffs fail to establish that a class action would be superior to other available methods, considering the possible range of damages sought by potential class members, the need for individualized assessments to resolve each class member's claim, and the difficulty in identifying potential class members. *Id.* at 15–16. Because of the alleged difficulties in managing a class, Defendant moves, in the alternative, to stay class notice and administration pending resolution of Plaintiffs' claims on the merits. *Id.* at 16–17.

## II. STANDARD OF REVIEW

Class action cases are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (quotations omitted). RCFC 23, which borrowed criteria from its counterpart in the Federal Rules of Civil Procedure (with some important distinctions), governs class actions in this Court. *See King v. United States*, 84 Fed. Cl. 120, 122 & n.2 (2008). The rule provides that one or more members of a class may sue in a representative capacity on behalf of all members of the class only if: (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the named plaintiffs are typical of the claims or defenses of the class, and (4) the named plaintiffs will fairly and adequately protect the class's interests in the case. RCFC 23(a). Additionally, a class action can be maintained only if the Court finds that "the United States . . . acted or refused to act on grounds generally applicable to the class," the common legal or factual questions "predominate over any questions affecting only individual [class] members," and that litigating the claims on a class basis "is superior to other available methods for fairly and efficiently adjudicating the controversy." RCFC 23(b)(2), (b)(3).

Plaintiffs bear the burden of affirmatively establishing that the RCFC 23 requirements are "in fact" met. *Dukes*, 564 U.S. at 350 (emphasis omitted); *see Fisher v. United States*, 69 Fed. Cl. 193, 197 (2006). In determining whether Plaintiffs have carried their burden, the Court must conduct a "rigorous analysis" and may probe beyond the pleadings to assess Plaintiffs' showing. *Dukes*, 564 U.S. at 350–51. Because RCFC 23's requirements are stated in the conjunctive, the failure of Plaintiffs "to satisfy any one of them is fatal to class certification." *Barnes v. United States*, 68 Fed. Cl. 492, 494 (2005).

# III. DISCUSSION

To resolve Plaintiffs' request for class certification, the Court must address two distinct questions: (1) does mootness prevent Plaintiffs from proceeding on behalf of a class with respect to their FY 2016/2017 claims, and (2) have Plaintiffs satisfied the RCFC 23 requirements to certify a class with respect to their FY 2015 claim? The Court answers both questions in the negative.

## A.     Plaintiffs' FY 2016/2017 Claims are Moot and, Therefore, a Class Action with Respect to those Claims is Moot.

### 1.     The ABCMR's Decisions Render Plaintiffs' FY 2016/2017 Claims Moot.

Defendant raises a threshold issue regarding certification of Plaintiffs' FY 2016/2017 claims. It argues that such claims have been mooted by the ABCMR's decisions finding each Plaintiff eligible for per diem allowances for FYs 2016 and 2017. *See* ECF No. 29 at 6. Plaintiffs disagree, contending that the ABCMR has done nothing more than determined that Plaintiffs are owed per diem payments for those fiscal years—payments they have yet to receive—and that additional relief can be afforded by the Court. *See* ECF No. 30 at 6–8.

Article III of the Constitution limits the jurisdiction of federal courts to cases and controversies.[5] U.S. CONST. art. III, § 2. This limitation ensures that federal courts adjudicate only "actual and concrete disputes, the resolutions of which have a direct consequence on the parties." *Monk v. Shulkin*, 855 F.3d 1312, 1316 (Fed. Cir. 2017) ("A case is said to lack an actual or concrete dispute where the relief sought by a plaintiff is satisfied or otherwise rendered moot."). "If an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the

---

[5] Although not a court created by Article III of the Constitution, the Court of Federal Claims applies Article III's case-or-controversy requirement. *See Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003) (collecting cases).

lawsuit,' at any point during the litigation, the action can no longer proceed and must be dismissed as moot." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 160–61 (2016).

A party asserting mootness must show that (1) "'there is no reasonable expectation . . . ' that the alleged violation will recur" and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Los Angeles Cty. v. Davis*, 440 U.S. 625, 631 (1979); *see Ferring B.V. v. Watson Lab'ys, Inc.-Fla.*, 764 F.3d 1382, 1391 (Fed. Cir. 2014). If, notwithstanding intervening events, the "court can fashion *some* form of meaningful relief" for the plaintiff, then the claim will not be considered moot. *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992) (emphasis in original); *see Kennedy v. United States*, 124 Fed. Cl. 309, 328 (2015), *rev'd on other grounds*, 845 F.3d 1376 (Fed. Cir. 2017) (dismissing as moot a claim related to repayment of ROTC scholarship benefits where a board of corrections afforded the plaintiff relief on that claim).

Here, Defendant has shown that the factors of mootness are met. Pursuant to the court's remand order, the ABCMR issued decisions for each Plaintiff recommending a correction of records to show that he or she is eligible for per diem entitlements for FYs 2016 and 2017 and payment of the per diem for those periods, less any amounts they may have already recovered. *See, e.g.*, ECF No. 22-1 at 17. As a result of these decisions, the Secretary of the Army is authorized to pay Plaintiffs the amounts owed for their FY 2016/2017 claims. 10 U.S.C. § 1552(c)(1). As evidenced by a letter submitted by Plaintiffs, the Secretary has since acted on the ABCMR's recommendation and, at least in the case of Plaintiff Lopez, corrected records accordingly. *See* ECF No. 30 at 24 (referencing a directive issued by the Office of the Secretary of the Army "that corrects your military records"). Additionally, DFAS has provided instructions

to at least one named plaintiff (and presumably the others) about how to initiate the process of calculating and issuing the payments owed to Plaintiffs. *Id.*

Given these circumstances, the alleged violation with respect to Plaintiffs' FY 2016/2017 claims cannot recur. *See Davis*, 440 U.S. at 631. Nor do Plaintiffs present a meaningful argument that it could.[6] Because the ABCMR resolved these claims in Plaintiffs' favor, the parties no longer have adverse legal interests with respect to these claims and thus there is no longer a "live issue[]" that this Court could adjudicate. *Shulkin*, 855 F.3d at 1316; *see DeFunis v. Odegaard*, 416 U.S. 312, 317 (1974) ("The controversy between the parties has thus clearly ceased to be 'definite and concrete' and no longer 'touch(es) the legal relations of parties having adverse legal interests.'").

The ABCMR's decisions also entitle Plaintiffs to payment of any amounts owed for their per diem allowances in FYs 2016 and 2017, thus completely extinguishing the effects of Defendant's prior decision not to pay these claims. *Davis*, 440 U.S. at 631. Plaintiffs' arguments to the contrary are unpersuasive. First, Plaintiffs complain that the ABCMR's decisions determined only that Plaintiffs are owed per diem for FYs 2016 and 2017 but did not determine what amounts Plaintiffs are owed. *See* ECF No. 30 at 6. As Plaintiffs acknowledge, however, payment of the amounts owed will be issued by DFAS once Plaintiffs submit the requisite information supporting their reimbursement calculations. *See id.*; *see also id.* at 24 (instructing Plaintiff Lopez to submit his travel office calculation, the evidence used for that calculation, and a copy of the approved action to DFAS for payment). That different agency components are responsible for the task of calculating and issuing the payments based on the correction of records

_____

[6] Indeed, it is unlikely that a similar violation could occur with respect to any per diem claims arising after FY 2017 or in the future. The Complaint alleges that "[t]he JTR published on May 1, 2017 abolished the per diem authorization for RC service members on temporary duty in excess of 181 days." ECF No. 1 ¶ 26.

does not undermine the legal significance of the ABCMR's decision recommending such correction. *See* 10 U.S.C. § 1552(c)(1).

Equally important, it appears that the primary reason Plaintiffs have not received a determination of the amount of per diem owed is because Plaintiffs have, as they put it, "rejected the Government's offer" to provide the information requested by DFAS in order to complete payment. ECF No. 30 at 8 n.2. Contrary to Plaintiffs' characterization, the ABCMR's decisions to correct Plaintiffs' records, and Plaintiffs subsequent entitlement to payment based on the correction, is not an *offer to resolve* Plaintiffs' FY 2016/2017 claims, it is a *resolution* of those claims. Plaintiffs cannot create an actual controversy, where one no longer remains, under Article III's justiciability requirements by refusing to collect what the parties now agree they are legally owed.[7] *See Russell v. United States*, 661 F.3d 1371, 1375 (Fed. Cir. 2011) (holding that the plaintiff's choice not to accept payment from the defendant in satisfaction of his claim was insufficient to avoid his individual claim becoming moot).

Plaintiffs also contend that, even if DFAS ultimately reimburses them in full for their FYs 2016 and 2017 per diem allowances, their claims are not moot because the Court could afford additional relief—*i.e.*, pre- and post-judgment interest, costs, attorneys' fees, and a possible class incentive award. *See* ECF No. 30 at 7. These are ancillary requests for relief, however, "wholly unrelated to the subject matter of the litigation," which do not on their own justify continuing litigation where the parties' basic dispute has terminated. *Diamond v. Charles*, 476 U.S. 54, 70 (1986) ("[T]he mere fact that continued adjudication would provide a remedy for an injury that is

---

[7] Because Plaintiffs have not yet initiated the process to receive their per diem entitlements, any objections at this point to the payments issued by DFAS, or the manner in which the Army calculates the per diem owed, would be speculative and thus would not support an argument that the FY 2016/2017 claims are still live.

only a byproduct of the suit itself does not mean that the injury is cognizable under Art. III," *id.* at 70–71); *see Russell*, 661 F.3d at 1375 ("The law is clear that when a court seeks to determine whether a plaintiff's claim is moot because the claim has been satisfied, the proper focus is on whether the plaintiff's principal claim has been resolved, not on whether ancillary expenses . . . have been paid or have accrued."). Indeed, the Supreme Court has expressly held that fees and costs are, "of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990); *see Veterans Contracting Grp., Inc. v. United States*, 743 F. App'x 439, 441 (Fed. Cir. 2018) ("a free-standing claim for fees and expenses of attorneys is not a viable basis for avoiding mootness").

Plaintiffs' reliance on interest as a form of relief raises a separate problem. Plaintiffs have not, as they must, identified any authority affirmatively and separately waiving sovereign immunity for interest on the damages award they seek against the United States. *See Marathon Oil Co. v. United States*, 374 F.3d 1123, 1126 (Fed. Cir. 2004); *see also Alaska Airlines, Inc. v. Johnson,* 8 F.3d 791, 798 (Fed. Cir. 1993) ("Interest may not be recovered against the government in the absence of an explicit waiver of sovereign immunity for that purpose."); *RuizGarcia v. United States*, 54 Fed. Cl. 41, 46 (2002) (holding that member of Marine Corps would not be entitled to pre-judgment interest even if he stated a claim for back pay).

Accordingly, the Court finds Plaintiffs' FY 2016/2017 claims are moot.

2. The Picking Off Exception to the Mootness Doctrine Does Not Apply to the FY 2016/2017 Claims.

Because this action was brought on behalf of a proposed class, Plaintiffs argue that the mootness analysis does not end with their individual claims. *See* ECF No. 27 at 12–13 n.8; *see* ECF No. 30 at 8–10. They contend that the FY 2016/2017 claims may still proceed on a class basis, notwithstanding that the ABCMR's decisions resolved the question of Plaintiffs' entitlement

to per diem payments in those fiscal years. *See id.* In response, Defendant argues that the class action mootness cases on which Plaintiffs rely are factually distinguishable, as well as inapposite in the context of RCFC 23 opt-in class actions. *See* ECF No. 29 at 7–9.

The Federal Circuit has not specifically addressed the issue of mootness in a RCFC 23 class action where the plaintiff's claim became moot before the court ruled on a pending class certification motion. With respect to its counterpart, Federal Rule of Civil Procedure ("FRCP") 23, numerous courts have adopted the general rule that "a class action must be dismissed for mootness when the personal claims of the named plaintiffs are satisfied and no class has been properly certified." *Clark v. State Farm Mut. Auto. Ins. Co.*, 590 F.3d 1134, 1138 (10th Cir. 2009) (collecting cases); *see, e.g.*, *Cruz v. Farquharson*, 252 F.3d 530, 533–34 (1st Cir. 2001); *Brunet v. City of Columbus*, 1 F.3d 390, 399 (6th Cir. 1993); *Sze v. INS*, 153 F.3d 1005, 1009 (9th Cir. 1998), *abrogated on other grounds*, *United States v. Hovsepian*, 359 F.3d 1144 (9th Cir. 2004).

Courts, however, have frequently recognized that the general rule is subject to certain mootness-avoidance exceptions. In *Sosna v. Iowa*, the Supreme Court suggested that in instances of pre-certification mootness it may be possible for certification "to 'relate back' to the filing of the complaint . . . depend[ing] upon the circumstances of the particular case" and especially where the issue could otherwise evade review. 419 U.S. 393, 402 n.11 (1975). As Plaintiffs note, some courts have relied on *Sosna* to hold that a defendant's unaccepted offer of judgment or settlement offer to the named plaintiff does not moot the putative class's claims, even where the court has not ruled on a class certification motion. *See* ECF No. 30 at 8–9 (collecting cases). One such case is *Pitts v. Terrible Herbst, Inc.*, in which the plaintiff brought a class action complaint against his employer alleging a claim for failure to pay minimum and overtime wages. 653 F.3d 1081, 1084 (9th Cir. 2011). Before the plaintiff sought class certification, the defendant-employer served a

Rule 68 offer of judgment to fully compensate the plaintiff. *Id.* at 1085. Although the plaintiff did not accept the offer, the district court dismissed the entire case as moot and entered judgment in the plaintiff's favor. *Id.* The Ninth Circuit reversed, concluding that the unaccepted offer of judgment did not moot the case because the plaintiff's claim was transitory "by virtue of defendant's litigation strategy" and thus otherwise capable of evading review. *Id.* at 1090–91. The Court held that applying this so-called "picking off" exception furthered the aims of Rule 23 class actions by preventing the defendant from buying off the named plaintiff's claim before a class could be certified. *See id.* at 1091 (citing *Deposit Guar. Nat. Bank, Jackson, Miss. v. Roper*, 445 U.S. 326, 339 (1980)).

Likewise, in *Unan v. Lyon*, the Sixth Circuit held that the picking off exception applied in a class action challenging a state health agency's misclassification of individuals eligible for comprehensive Medicaid coverage. 853 F.3d 279, 287 (6th Cir. 2017). There, the agency corrected the error with respect to the named plaintiffs within days of the complaint being filed and subsequently resolved the errors with respect to putative class members as they became known. *Id.* at 286. The Court held that the suspicious timing of the agency's corrective actions, which occurred through an *ad hoc* process more akin to strategic litigation avoidance rather than standard operating procedure, supported application of the picking off exception. *Id.* at 286–87.

Here, as in *Pitts* and *Unan*, Plaintiffs claim that Defendant has "attempt[ed] to manufacture mootness by picking off" their individual claims. ECF No. 30 at 9. The facts of the instant matter, however, are materially distinguishable from the cases Plaintiffs cite and do not support application of a mootness avoidance exception. First, considering the totality of the circumstances, the timing of Defendant's actions in this case are not suspect. *See Unan*, 853 F.3d at 286 (finding that correcting challenged error two days after filing of complaint was "suspect"). Although the

PDASA issued a determination that Plaintiffs are entitled to per diem payments for FYs 2016 and 2017 only one week after Plaintiffs filed their Complaint, neither the letter itself nor the surrounding circumstances demonstrate that he did so in response to the litigation or in an attempt to moot Plaintiffs' claims. *See generally* ECF No. 13-1. Rather, the letter appears to be the long-awaited culmination of a review conducted at Plaintiffs' request. *See id.* at 1 ("I apologize for the delay in responding to your initial letter of March 7, 2018."). Contrary to Plaintiffs' contention, nothing about that review seems "expedited," ECF No. 30 at 10, as shown by the correspondence beginning in May 2018 between Plaintiffs' counsel and the Army staff action officer assigned to review Plaintiffs' cases, *see* ECF No. 38-1 at 155–72. Despite much delay, as of February 21, 2019, the review appears to have been completed and the proposed response was being reviewed by the Army's lawyers. *Id.* at 172. It is certainly understandable that after 16 months Plaintiffs chose to initiate this action rather than wait any longer for the Army's final response. But the circumstances do not suggest a strategic rather than incidental decision by the Army to reverse its prior position on Plaintiffs' FY 2016/2017 claims.

Additionally, the PDASA's decision is not the action that purportedly mooted Plaintiffs' FY 2016/2017 claims. Nor did Defendant subsequently make an offer of settlement or judgment, as in the cases on which Plaintiffs rely. *See* ECF No. 30 at 8–9 (citing cases that discuss "settlement overtures as a tactic to 'pick off' named class action plaintiffs," *id.* at 8). Here, the claims were mooted by the decisions of the ABCMR during a remand ordered pursuant to the court's authority provided in the Tucker Act and the rules of this court. *See* 28 U.S.C. § 1491(a)(2); *see also* RCFC 52.2. The rationale underlying the picking off exception is inapplicable in this case where Defendant did not (and could not) act unilaterally to moot Plaintiffs' claims. In a military pay case, the Government may request a voluntary remand, but it cannot compel remand proceedings

without the court's permission after due consideration of any objections by the plaintiff. *See* RCFC 52.2 ("In any case within its jurisdiction, the court, on motion or on its own, may order the remand of appropriate matters to an administrative or executive body or official."). Whether the court remands a case for the agency to voluntarily reconsider its prior position is a matter within the court's discretion, and the court may deny such request if it finds that it is frivolous or made in bad faith. *See SKF USA Inc. v. United States*, 254 F.3d 1022, 1029 (Fed. Cir. 2001). Given the court's exercise of discretion to order remand in this case, it cannot fairly be said that the ABCMR's decisions were an at attempt to "buy off" Plaintiffs' claims before a class could be certified. *Pitts*, 653 F.3d at 1088. After all, the ABCMR recommended only partial relief on Plaintiffs' claims. Nor does use of the remand procedures in this case make it likely that any similar claims of the proposed class will evade judicial review. The authority to allow an agency to correct its mistake through remand resides solely with the reviewing court. It is, therefore, the Court—not the Government—which has the discretion to determine how a particular litigation proceeds, depending on the circumstances of the case.

The use of "established, standardized procedures" to both obtain an order remanding Plaintiffs' case to the ABCMR and to adjudicate Plaintiffs' claims before the ABCMR likewise weighs against the application of the picking off exception here. *Unan*, 853 F.3d at 286. Courts have declined to apply mootness avoidance theories in circumstances where an agency granted the named plaintiffs relief through a standard process or where the facts did not establish that the decision to afford relief was aimed at evading judicial review. *See, e.g.*, *Sze*, 153 F.3d at 1008; *Cruz*, 252 F.3d at 535; William B. Rubenstein, *Newberg on Class Actions* § 2:15 (5th ed. 2015) (noting that, outside the context of a Rule 68 offer, "a defendant may unilaterally accord individual

relief to a named plaintiff incidentally or as a matter of standard operating procedure without any specific intention of preventing judicial review of class claims").

The Ninth Circuit's decision in *Sze* is instructive. In *Sze*, the plaintiffs brought a class action suit against the Immigration and Naturalization Service ("INS"), seeking to compel decisions on naturalization applications that had been pending longer than the 120-day statutory adjudication period. *See Sze*, 153 F.3d at 1007. By the time the case was briefed before the Ninth Circuit, each plaintiff had received a decision on his or her application. *Id.* at 1008. The Court held that the plaintiffs could not avoid mootness because they did not show that INS acted on their applications "because of the litigation." *Id.* Rather, as could be said of the instant case, the agency acted "in due course, albeit a significantly delayed due course." *Id.*; *see Cruz*, 252 F.3d at 535 (holding that the facts did not establish that the INS was thwarting judicial review by quickly issuing decisions on petitions pending in the standard adjudication process before the court could rule on the merits or class certification).[8]

Defendant contends that Plaintiffs' mootness avoidance argument separately fails because the cases Plaintiffs cite addressed mootness in the context of FRCP 23, which unlike RCFC 23 provides for opt-out classes. *See* ECF No. 29 at 8. Defendant contends that the Supreme Court's decision in *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66 (2013), is more analogous. In *Symczyk*, the Court held that the defendant's offer of judgment fully satisfying the plaintiff's claim

---

[8] Although not raised in the briefs, Plaintiffs emphasized at oral argument that the Court should not find the class action moot given the potential running of the six-year statute of limitations, which Plaintiffs assert would bar any FY 2015 per diem claims of the proposed class. There is, however, no claim of mootness relating to Plaintiffs' FY 2015 claim. Regardless, Supreme Court precedent suggests the contrary. *See Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983) (holding that the filing of a class action tolls the statute of limitations as to all putative class members, including those individuals who choose to intervene and those that file separate actions after class certification is denied).

in a Fair Labor Standards Act ("FLSA") case mooted the plaintiff's collective-action allegations. *Id.* at 75. The Court in *Symczyk* distinguished a FLSA collective action from a FRCP 23 class action, explaining that "essential" to its decision in *Sosna* was the fact that "a putative class acquires an independent legal status once it is certified under Rule 23." *Id.* No such status arises in a FLSA collective action where "[t]he sole consequence of conditional certification" is the distribution of a notice to employees who become parties to the case "only by filing written consent with the court." *Id.* As Defendant notes, FLSA collective actions share a common feature with RCFC 23 class actions: they both require that similarly situated persons affirmatively opt-in. *See* ECF No. 29 at 12.

The parties do not cite any decisions of the Federal Circuit or other judges of this court applying *Symczyk* to the question of class certification under RCFC 23. The Court located two potentially relevant cases on its own, neither of which particularly help Defendant. In the first, *Shulkin*, the Federal Circuit discussed *Symczyk* in addressing the question of whether a claimant in the United States Court of Appeals for Veterans Claims could continue to appeal the denial of class certification where he received full relief on his claim during the pendency of his appeal. *Shulkin*, 855 F.3d at 1316–18. The Court rejected the Government's mootness argument, which (like Defendant's argument) drew on *Symczyk*'s discussion of the independent legal status of a FRCP 23 putative class. *Id.* at 1317 (explaining that the "primary" rationale underlying *Symczyk* was that the plaintiff's claim was mooted before a ruling on class certification). In *Horvath v. United States*, another judge of this court cited *Symczyk* without extended discussion to support the conclusion that a plaintiff in a civilian pay case had standing such that the court could decide his RCFC 23 class certification motion. 149 Fed. Cl. 735, 745 (2020) ("FRCP 23—and

presumably RCFC 23—but not the FLSA's collective-action procedure, creates a class with legal status independent of the class representative.").

Here, it is not necessary for the Court to break new ground on whether *Symcyzk*'s rationale applies equally to RCFC 23 class actions. Even applying *Sosna* and other cases addressing mootness in the context of FRCP 23 class actions, Plaintiffs have not shown that an exception to the general mootness rule would allow them to proceed on their FY 2016/2017 claims on behalf of the proposed class.

**B.      The Remaining FY 2015 Claim Does Not Meet the Requirements for Class Certification.**

Unlike the FY 2016/2017 claims, it is undisputed that Plaintiffs' FY 2015 claim presents a live controversy, the resolution of which will affect Plaintiffs' legally cognizable interests. Accordingly, the Court must decide whether Plaintiffs have met the requirements of RCFC 23 to bring their FY 2015 claim on behalf of the proposed class. The Court finds that Plaintiffs fail to meet their burden on the numerosity, commonality, typicality, and superiority factors.[9]

1.      <u>Numerosity</u>

The first prerequisite for class certification requires a named plaintiff to demonstrate that the proposed class is so numerous that joinder is impracticable. *See* RCFC 23(a)(1). A plaintiff need not precisely identify the number of potential class members that exist, but it must do more than present speculation or conclusory allegations. *See Fisher*, 69 Fed. Cl. at 198. Courts have had varying views on the number of class members necessary to meet the numerosity requirement but have in some instances presumed numerosity is satisfied by the presence of 40 class members. *See id.* at 199 (collecting cases).

---

[9] RCFC 23's adequacy requirement does not appear to be in dispute.

Plaintiffs contend that the number of proposed class members in the instant case could reach as high as the "hundreds" or "thousands." ECF No. 30 at 13; ECF No. 27 at 8 (claiming the "pool of potential class members consists of hundreds, possibly thousands, of RC soldiers"). They rely on two sets of figures to support their numerosity showing: (1) the numbers of soldiers on temporary duty orders in certain years and (2) statistics reported in the 2015 Audit Report and a follow-on 2016 Army-wide audit report conducted to investigate potentially inappropriate per diem allowances associated with TCS orders. *See* ECF No. 27 at 8; *see also* ECF No. 30 at 13–14. The first item of data does little to establish their burden. As Defendant points out, that there were 405 RC soldiers assigned to long-term temporary duty at Fort Hood in 2006, or that the Army issued more than 1,280 TCS orders in FY 2013, does not establish (or provide a sufficient basis to reasonably infer) that any of the soldiers in these groups were denied per diem allowances. *See* ECF No. 29 at 11–12.

The audit reports are more specific to the claims raised by Plaintiffs and thus require closer analysis. The 2015 Audit Report identifies 146 soldiers who received per diem entitlements in connection with TCS orders. *See* ECF No. 38-1 at 29. As an initial matter, only soldiers who were *denied* per diem (or whose per diem was recouped) would be relevant to the numerosity analysis. In any event, of these soldiers, the auditors found that 33 appropriately received per diem and 100 received unauthorized per diem because they did not have the minimal one-day break in service required by the JTR. *Id.* at 36, 38. These soldiers, therefore, would not be potential class members. At most, only 13 soldiers reviewed in the 2015 Audit Report would potentially fall within the ambit of the proposed class, if their per diem payments were recouped. The auditors found that these soldiers were entitled to per diem allowances under the plain language of the JTR but should have been denied payments because the length of their breaks in service did not meet the intent of

the JTR. *See id.* at 36 (finding the JTR's intent not met by break in service of less than 30 days). But even assuming payments were recouped, these soldiers would have claims akin to Plaintiffs' now-moot FY 2016/2017 claims, which were based on the application of the erroneous 2015 Audit Report rule. This data is, therefore, not especially relevant in determining whether the numerosity requirement is met for certifying a class on Plaintiffs' FY 2015 claim.

The 2016 Audit Report identifies 198 soldiers who transitioned between PCS and TCS orders at the same duty station with a break in service of less than 30 days, 50 of whom received per diem entitlements. *See Audit of Mobilized Soldiers on [TCS] Orders—Armywide* ("2016 Audit Report"), Audit Report A-2016-0038-FMX at 71, 72, ECF No. 38-1. Aside from the threshold distinction of having received per diem, 23 of the 50 soldiers did not have a minimum one-day break in service and thus would not be part of the class. *Id.* at 71. Like the 13 soldiers discussed in the 2015 Audit Report, 27 soldiers reviewed in the 2016 Audit Report would potentially fall within the proposed class, if the Army recouped their per diem payments as the auditors recommended. *See id.* at 71, 73 (concluding that soldiers should not have received per diem entitlements, even though they met the one-day break in service requirement, because the length of their breaks in service contravened the intent of the JTR; recommending a 90-day or more break in service requirement). But again, these soldiers would have claims like Plaintiffs' now-moot FY 2016/2017 claims—not the remaining FY 2015 claim.

Through simple subtraction, that leaves 148 soldiers who did not receive per diem payments. Without more information, it is not possible for the Court to determine whether this figure indicates a likelihood that there are numerous potential class members. The audit report does not explain why such payments were not received and, importantly, does not confirm that per diem payments were denied. It does not provide sufficient information to determine whether these

soldiers potentially meet the criteria of Plaintiffs' class definition—*e.g.*, that these soldiers traveled to their HORs at the end of their PCS orders and were released from active duty, were ordered back to active duty on TDY orders authorizing 55% per diem, requested per diem in accordance with the JTR, and were denied per diem. Nor does it help the Court determine whether any of these soldiers would have claims similar to Plaintiffs' remaining FY 2015 claim. To be sure, it is certainly possible that some of these 148 soldiers could include proposed class members. Plaintiffs, however, have not provided adequate evidence from which the Court can reliably estimate that number. *See Gross v. United States*, 106 Fed. Cl. 369, 377 (2012). Thus, they have not met their burden of showing that the proposed class is so numerous that joinder is impracticable.

2.      Commonality

The commonality requirement under RCFC 23 requires a three-part showing. Plaintiffs must demonstrate that (1) the claims of the class share common questions of law or fact, (2) those common questions predominate over questions affecting only the named plaintiffs, and (3) the United States has acted (or refused to act) on "grounds generally applicable to the class." RCFC 23(a)(2), (b)(2), (b)(3). To establish the existence of a common question, Plaintiffs must show that their claim depends on a common contention that is capable of class-wide resolution, meaning that its determination "will resolve an issue that is central to the validity of . . . the claim[] in one stroke." *Dukes*, 564 U.S. at 350; *see Monk v. Wilkie*, 978 F.3d 1273, 1277 (Fed. Cir. 2020) ("Commonality requires that a proposed class action presents a common question that is capable of a common legal answer.") (emphasis omitted).

Here, Plaintiffs seek to certify a class of reservists who received certain types of mobilization orders authorizing a per diem allowance and who were denied that per diem by the

Army, despite having had a minimal one-day break in service as required by the JTR. *See* ECF No. 27 at 5–6. Plaintiffs claim that the common question shared by the class is "whether the Army violated the JTR" by systemically "failing to pay per diem to [these] RC soldiers." *Id.* at 11; *see* ECF No. 30 at 15. Merely alleging that proposed class members "have all suffered a violation of the same provision of law," however, is not sufficient. *Dukes*, 564 U.S. at 550. As the Supreme Court explained in *Dukes*, laws "can be violated in many ways." *Id.*

The alleged violation of law relevant to Plaintiffs' remaining FY 2015 claim relates to the ABCMR's application of the JTR provision prohibiting retroactive amendment of orders to create a per diem allowance. On this point, Plaintiffs articulate the common question of law as follows: whether denial of per diem based on the retroactive amendment of an order to reflect a break in service is lawful if the reservist actually took at least a one-day break in service per the JTR's requirement. ECF No. 27 at 11. Plaintiffs' class definition—including soldiers who were denied per diem regardless of reason—does not reflect that commonality. *See Horvath*, 149 Fed. Cl. at 745 (holding that commonality was not met for a purported class of Secret Service agents who were denied statutory overtime pay, regardless of whether the denial implicated the narrow rule challenged by the named plaintiff). Plaintiffs have thus not demonstrated that resolution of the retroactive-amendment question will resolve the proposed class's claims in one stroke. As Defendant notes, the answer to that question would be entirely irrelevant to the claims of any class member whose orders were not retroactively amended. *See* ECF No. 29 at 13.

Even if the class definition could be narrowed only to reservists whose per diem was denied by application of the JTR's retroactive-amendment rule, Plaintiffs have not shown that the common question identified would predominate over individualized questions of law or fact. *See* RCFC 23(b)(3). The predominance requirement "may be characterized as a determination of the

substantiality of the 'generalized proof' required to resolve certain issues and not others[,] or the logical outgrowth of a challenge to a 'system-wide failure.'" *Curry v. United States*, 81 Fed. Cl. 328, 334 (2008) (internal citations omitted).

Determining entitlement to per diem under Plaintiffs' FY 2015 claim will likely require an individualized assessment of each proposed class member's orders, evidence establishing whether each member in fact had a minimal break in service and returned to his or her HOR between tours, the circumstances surrounding the retroactive amendment of the member's orders, as well as the reasons for denial of the member's per diem claims. Contrary to Plaintiffs' contention, such analysis is not necessary merely to make individualized damage determinations, which generally do not preclude class certification. *See* ECF No. 30 at 15 (quoting *Barnes*, 68 Fed. Cl. at 498). It is necessary to establish the claim in the first instance. *See, e.g.*, *Jaynes v. United States*, 69 Fed. Cl. 450, 457 (2006) (finding predominance requirement not met where class members could not establish their entitlement to back pay on a class-wide basis using generalized proof); *Gross*, 106 Fed. Cl. at 379 (same).

The relevant JTR provision forbids modifying an order retroactively to create a per diem allowance "***except*** to correct/complete an order to show the original intent." JTR ¶ 4950(A)(4) (Oct. 1, 2014), ECF No. 38-1 at 6 (emphasis in original). Assessing whether the retroactive amendment of a class member's order violated the JTR thus appears, by its nature, individualized or at least unlikely to be capable of determination on a class-wide basis. The Comptroller General opinion cited in the relevant JTR provision illustrates the fact-specific analysis that may be necessary. *Id.; see Assistant Comptroller Gen. Yates to the Sec'y of the Navy*, 24 Comp. Gen. 439, 442 (Dec. 9, 1944) (holding that "[t]he circumstances in which an attempted retroactive modification or correction of a travel order may be recognized as authorizing an additional

payment" is "exceptional" and depends on "the particular facts and circumstances involved in each case"). In sum, Plaintiffs have not shown that common questions raised by their FY 2015 claim predominate over individual issues.

Perhaps relatedly, Plaintiffs have not shown with respect to their FY 2015 claim that the United States has treated the class on similar grounds. *See* RCFC 23(b)(2). These grounds could be "a policy or practice generally applicable to the class or even a common error shown to have widespread effect." *Horvath*, 149 Fed. Cl. at 746. Plaintiffs have identified no policy, rule, or widespread practice related to the grounds underlying their FY 2015 claims—*i.e.*, the alleged improper application of the JTR's retroactive-amendment rule. Plaintiffs rely on an excerpt of the 2015 Audit Report that discussed "a common practice among commanders . . . to change reservists' orders so that they accurately reflect a break in service." ECF No. 30 at 16 (citing ECF No. 38-1 at 43). The cited discussion reflects information obtained during audit interviews at two military bases (Fort Hood and Fort Bliss) and does not clearly refer to the same type of order modification at issue in this case. Specifically, the 2015 Audit Report explained that unit commanders "started making sure their Soldiers received a break in service of more than 1 day so that they would be eligible for TCS entitlements." ECF No. 38-1 at 43. As an example, it discussed the case of one solider whose PCS order was amended to end nine months earlier than originally intended and who, after a two-day break in service, began a new TCS order authorizing the more generous TCS entitlements.[10] *Id.* at 43–44. The report does not indicate whether this amendment was done retroactively, but based on the discussion of the approval process to amend the order for "early

---

[10] Plaintiffs, on the other hand, had their follow-on TCS orders retroactively amended to start one or two days later than originally drafted so that there was at least a one-day break in service following the scheduled end date of their PCS orders. *See, e.g.*, ECF No. 22-1 at 6–8 (Lohmann Decision Letter) (providing chronology of Plaintiff Lohmann's relevant orders).

release[,]" the Court infers it was prospective. *Id.*; *see id.* at 49 (recommending changes to the approval process for orders "that *are going to be* amended to end early" with a follow-on TCS order) (emphasis added). The report also does not indicate whether the soldier discussed was denied reimbursement for any per diem claimed. Such a prospective modification, although clearly disfavored by the audit report, does not plainly involve the application of the JTR's retroactive-amendment rule, which is central to Plaintiffs' claim.

To be sure, as reflected in the ABCMR's decisions, Plaintiffs all appear to have been treated similarly by the Army with respect to their FY 2015 claim. Each had orders that were retroactively amended to reflect at least a one-day break in service between active duty tours, each allegedly traveled to his or her HOR during the break in service, and each had claims for per diem in FY 2015 denied based on the JTR's provision prohibiting retroactive modification to create a per diem allowance. Plaintiffs, however, are all reservists who were assigned to the same military base (Fort Hood) in FYs 2015 through 2017 as part of the same task force (Task Force Braveheart). *See* ECF No. 13-1. Neither the similarities of Plaintiffs' discrete group, nor the example discussed in the 2015 Audit Report, is sufficient to carry Plaintiffs' burden of showing that the Army had a policy or practice generally applicable to the Army-wide class they seek to represent for the FY 2015 claim.

3.    Typicality

Plaintiffs likewise fail to demonstrate the typicality requirement for many of the same reasons. In some respects, the commonality and typicality requirements merge. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982). Both serve as "guideposts" for determining whether maintaining the suit as a class action will be economical and whether the claims of the named plaintiff and class "are so interrelated that the interests of the class members will be fairly and

adequately protected in their absence." *Id.* Like commonality, typicality does not require identicalness of claims. *See Barnes*, 68 Fed. Cl. at 498. Rather, typicality is met "when 'each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Gross*, 106 Fed. Cl. at 381 (quoting *Barnes*, 68 Fed. Cl. at 498).

The legal argument at issue in Plaintiffs' FY 2015 claim is grounded on the ABCMR's determination that Plaintiffs' orders were retroactively amended in violation of the JTR. Plaintiffs, however, seek to certify a class of soldiers who either were denied their per diem or had their per diem recouped without regard to the basis for the Army's action. *See* ECF No. 27 at 5–6. Proposed class members may have had their claims denied for any number of reasons unrelated to an alleged violation of the JTR or Plaintiffs' FY 2015 claim. *See Fisher*, 69 Fed. Cl. at 200 (holding that typicality requires that the legal claims of the named plaintiff "share the same essential characteristics as the claims of the class at large").

Even if the Court imposed a more focused class definition, Plaintiffs have not demonstrated that their claims are typical of the claims of any proposed class members whose per diem allowance was denied due to a retroactive modification of their orders. Plaintiffs argue that "it is reasonable to assume that many other reservists had their orders changed . . . to reflect their entitlement to per diem." ECF No. 30 at 16 (citing ECF No. 38-1 at 43). As discussed above, the example provided in the 2015 Audit Report does not appear to "share the same essential characteristics" as the retroactive amendment at issue in Plaintiffs' FY 2015 claim. *Fisher*, 69 Fed. Cl. at 200. Therefore, Plaintiffs have not provided the Court with a basis to conclude that their claims are characteristic of the proposed class.

4.    Superiority

To meet the superiority requirement, a plaintiff must show that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." RCFC 23(b)(3). The rule provides a list of non-exhaustive factors to consider, including the class's interests in prosecuting their own separate actions, whether class members have already begun litigation involving the dispute at issue, and the anticipated difficulties in managing the class. *Id.*; *see Fisher*, 69 Fed. Cl. at 193. The parties' dispute over superiority focuses on the first and third of these considerations.[11]

Plaintiffs argue that proposed class members are unlikely to bring separate, individual actions in light of the size of the damage awards that they may recover and that, without certification and notification, many will not know they have a claim. *See* ECF No. 27 at 15; *see also* ECF No. 30 at 16–17. Relying on Plaintiffs' estimate that some class members may have damages exceeding $50,000 or $100,000, Defendant argues that such high-range damages cut against class certification. *See* ECF No. 29 at 15. It also emphasizes the significant difficulties with identifying and managing the class. *Id.* at 15–16.

The Court largely agrees with Defendant on this factor. The size of the proposed class's claims do not make this case a prime candidate for class treatment. "There is no magic number" that dictates whether a claim is too small or large enough to warrant class certification. *Fisher*, 69 Fed. Cl. at 205. "The relevant inquiry is whether the class members would pursue individual claims if the class were not certified." *Id.* Plaintiffs contend that some proposed class members could have very large claims that amount to more than $50,000 or even $100,000—an amount that

---

[11] As to the second consideration, neither party has pointed the Court to any litigation brought by potential class members involving the claims asserted by Plaintiffs in this case.

does not strike this Court as "too small to justify being brought individually." *Curry*, 81 Fed. Cl. at 338. Even if some potential class members do not have such significant damages, Plaintiffs have not cited evidence to support their assertion that "many other [class members] will likely have damages that are far less." ECF No. 27 at 15; *see Gross*, 169 Fed. Cl. at 384 ("Plaintiff has provided no evidence—not even a ballpark estimate—regarding the amounts of the claims that he or other prospective class members might assert."). Using the findings of the audit reports that investigated the type of per diem entitlements at issue, soldiers identified by the auditors as receiving unauthorized per diem under similar orders received on average between $15,000 and $22,000. *See* ECF No. 38-1 at 37, 40 (finding that 100 soldiers received about $1.5 million and 13 soldiers received $286,000 in unauthorized per diem entitlements); *see also id.* at 70 (finding that 50 soldiers received $870,534 in unauthorized per diem entitlements).

Plaintiffs have not persuasively argued why soldiers with $15,000–$100,000 in potential damages would be unlikely to pursue their claims outside of a class action. They note that some proposed class members may be in or near retirement, and thus less likely to initiate a claim, but acknowledge that most of the named Plaintiffs are in that category too. *See* ECF No. 30 at 17. Unquestionably, neither Plaintiffs' retirement status nor the size of their damages has prevented them from persistently pursuing their claims over the past several years.

Plaintiffs also argue that a class action is superior because absent "formal notification" the proposed class members are not likely to know they have a claim. *See id.* According to Plaintiffs, having been informed by the Army that they were not entitled to per diem based on the 2015 Audit Report rule, potential class members have no reason to "re-engage the Army's system without some prompting" now that the ABCMR has recognized that the rule is erroneous. *Id.* Defendant indicated in its remand motion that "the Army has agreed to provide an appropriate notice to its

soldiers that they might be entitled to compensation" "should the ABCMR determine that plaintiffs are entitled to some or all of the relief they seek." *See* ECF No. 12 at 5. Defendant's counsel indicated at oral argument that the Army still intends to issue that notice Army-wide once the Court has resolved the class certification issue. Defendant's planned notice would thus appear to provide the prompting Plaintiffs seek for proposed class members who were affected by application of the 2015 Audit Report rule.

Finally, the parties dispute the level of difficulty involved in managing the proposed class. Defendant argues that it would likely be difficult for the Army to identify all proposed class members given that there is "no centralized database with a complete order history to query." ECF No. 29 at 20. The limitations on the Army's ability to identify in an automated manner the entire class is borne out in the 2016 Audit Report, which discussed the difficulties auditors faced in performing "a 100-percent review" of soldiers with mobilization orders like Plaintiffs' orders. ECF No. 38-1 at 70–71. That said, Defendant's concerns are "hardly unique" to this case and such difficulties alone should not prevent the Court from certifying a class where it would otherwise be appropriate. *Barnes*, 68 Fed. Cl. at 500–01. Plaintiffs correctly note that the type of notice the Army already intends to provide in light of the ABCMR's decisions in this case could be implemented in the context of a class action. *See* ECF No. 30 at 18–19. The proposed class definition sets forth criteria that will likely allow potential class members to self-identify and opt-in, if they choose to do so. *See Curry*, 81 Fed. Cl. at 338. And the Army has databases (albeit decentralized) that could be manually reviewed to confirm class membership. *See* ECF No. 38-1 at 71 (noting that auditors manually reviewed mobilization orders for 737 RC soldiers during the 2016 Audit Report review).

However, while sufficiently identifying the class may not present an obstacle to certification, there would be significant difficulties determining each proposed class member's entitlement to per diem under Plaintiffs' FY 2015 claim. As discussed above, the Court finds that an individualized assessment of each class member's particular facts and circumstances would likely be necessary to determine whether the Army improperly denied per diem payments as a result of a retroactive amendment of orders. As such, litigating this case as a class action would not likely "achieve economies of time, effort, and expense." *Barnes*, 68 Fed. Cl. at 499; *see Fisher*, 69 Fed. Cl. at 206.

Accordingly, the Court finds that the cost/benefit analysis of the superiority factor tips in favor of denying certification.

## IV. CONCLUSION

For these reasons, the Court **DENIES** Plaintiffs' Motion for Class Certification and Appointment of Class Counsel (ECF No. 13) and Amended Motion for Class Certification and Appointment of Class Counsel (ECF No. 27). The Court **DENIES AS MOOT** Defendant's alternative request to stay administration of any class until a dispositive ruling in this case (ECF No. 29).

The parties shall submit a joint status report by no later than 14 days from the date of this Order proposing a schedule for further proceedings in this matter, including deadlines for the filing of the administrative record and cross-motions for judgment on the administrative record.

**SO ORDERED.**

Dated: June 29, 2021        */s/ Kathryn C. Davis*
                                          KATHRYN C. DAVIS
                                          Judge