## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PAUL LOHMANN, *et al.*, | ) |
| | ) |
| Plaintiffs, | )     No. 19-cv-994C |
| | ) |
| v. | )     Filed: July 19, 2022 |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## <u>OPINION AND ORDER</u>

Plaintiffs are nine reserve component ("RC") soldiers of the United States Army, who challenge decisions of the Army Board for Correction of Military Records ("ABCMR" or "Board") denying them per diem payments for fiscal year ("FY") 2015. Plaintiffs contend they are entitled to these payments pursuant to 37 U.S.C. § 474 and the applicable Joint Travel Regulations because they served on temporary duty at Fort Hood, Texas, in FY 2015 under temporary change of station orders authorizing per diem. They claim the ABCMR's denials were arbitrary and capricious because the Board ignored evidence demonstrating that Plaintiffs had the requisite one-day break in service before starting their temporary duty tours and mischaracterized the amendments of Plaintiffs' FY 2015 orders as improper attempts to create a "false break in service." The matter is before the Court on the parties' Cross-Motions for Judgment on the Administrative Record.

For the reasons discussed below, the Court finds that the ABCMR's decisions were arbitrary and capricious, as well as unsupported by substantial evidence. The Court further finds that a remand is appropriate for the Board to address the deficiencies in the decisions. Therefore, Plaintiffs' Motion for Judgment is **GRANTED IN PART**, and the Government's Cross-Motion for Judgment is **DENIED**.

## I. BACKGROUND

### A.     Statutory and Regulatory Background

As relevant here, the Secretary of Defense may order RC soldiers to active duty under permanent change of station ("PCS") or temporary change of station ("TCS") orders.  *See* 10 U.S.C. §§ 12301(d), 12302; Def.'s Resp. to Pls.' Mot. for J. Admin. R. & Cross-Mot. for J. Admin. R. at 6–7, ECF No. 48.  Pursuant to the Department of Defense's ("DoD") travel regulations, RC soldiers are entitled to various travel and transportation allowances when serving under these orders, depending on which type of order they receive.  *See* Joint Travel Regulations ("JTR"), ch. 4, pt. J § 4950.A (Oct. 1, 2014); *id.* ch. 5, pt. A; *id.* ch. 10; *see also* 37 U.S.C. § 474(a)(4) (2013).

The JTR authorized the Secretary of the Army to provide per diem to certain service members, including RC soldiers, assigned on temporary duty ("TDY") to support a contingency operation.[1]  JTR, ch. 4, pt. J, § 4950.A.1.  Orders that direct service members to a TDY location are referred to as TCS orders—in contrast with PCS orders.  *See* ECF No. 48 at 6–7.  Service members who were given TCS orders assigning them TDY to a contingency operation for more than 180 consecutive days at one location were entitled to a per diem rate of 55 percent of the locality per diem rate.[2]  JTR, ch. 4, pt. J., § 4950.A.2.

---

[1] DoD previously issued travel regulations in two separate volumes: Volume 1, the Joint Federal Travel Regulations ("JFTR"), applied only to uniformed service members; and Volume 2, the JTR, applied only to DoD civilian employees.  The JTR published on October 1, 2014, merged the two volumes.  *See* JTR, CW 1–25 ("JFTR Crosswalk to Merged JTR, Ch. 1–10" and "JTR Crosswalk to Merged JTR, Ch. 1–7").  The travel regulations applicable to Plaintiffs' claims appear in both the JFTR and JTR because Plaintiffs' FY 2015 TCS orders were issued prior to October 1, 2014, and then amended several times after that date.  Regardless, the language of the relevant provisions in the JFTR did not change when DoD merged the two volumes of travel regulations.  Except where otherwise noted, this opinion cites only to the October 2014 JTR.

[2] DoD has since eliminated this per diem allowance.  As of August 1, 2017, assignments of 181 days or more at one location become a PCS, and per diem is not payable.  JTR, ch. 3, pt. A, § 030302.B.2.a (Aug. 1, 2017).

Under the JTR, a TDY location can be changed to a Permanent Duty Station ("PDS"); however, a PDS cannot be changed to a TDY station once travel to the PDS is complete. *Id.*, ch. 2, pt. C, § 2205.A.2.  The parties do not dispute that, to qualify for the contingency operation per diem under a TCS order, a service member must have a break in service of at least one calendar day between his or her PCS and TCS orders. *See* Pls.' Mot. for J. Admin. R. at 24, ECF No. 46; ECF No. 48 at 8.  Further, the JTR prohibits the revocation or modification of a travel order "retroactively to create, deny, or change an allowance ***except*** to correct/complete an order to show the original intent."  JTR, ch. 4, pt. J, § 4950.A.4; *see id.*, ch. 2, pt. C, § 2205.A.1.

### B.    Findings of Fact

Plaintiffs are MSG David Carpenter, MAJ Joseph Fields, COL Paul Lohmann, SSG Miguel Lopez, MAJ (Ret.) Nancy Patrick, SSG Miles Samuel, SGM Lucio Valdez, SFC Thomas E. Vaughn, and LTC Mark Williford.  The relevant facts of each Plaintiffs' claim are substantially the same.  Each was serving on active duty at Fort Hood, Texas, from 2013 to 2014 under PCS orders issued pursuant to 10 U.S.C. § 12301(d).  Carpenter Admin. R. 115–16, ECF No. 45-1 ("Carpenter AR"); Fields Admin. R. 107, ECF No. 45-2 ("Fields AR"); Lohmann Admin. R. 32, ECF No. 45-3 ("Lohmann AR"); Lopez Admin. R. 96, ECF No. 45-4 ("Lopez AR"); Patrick Admin. R. 101, ECF No. 45-5 ("Patrick AR"); Samuel Admin. R. 33, ECF No. 45-6 ("Samuel AR"); Valdez Admin. R. 127, ECF No. 45-7 ("Valdez AR"); Vaughn Admin. R. 109, ECF No. 45-8 ("Vaughn AR"); Williford Admin. R. 33–34, ECF No. 45-10 ("Williford AR").[3]  These PCS orders directed Plaintiffs, upon the completion of duty, to return to their homes of record ("HOR") "and upon arrival be released from active duty."  *Id*.  With a few exceptions, Plaintiffs received an

---

[3] For ease of reference, this opinion cites to the bates-stamped page number of each Administrative Record rather than the ECF page number.

order dated September 23, 2014, expressly releasing them from active duty effective September 26, 2014 ("September 23 Orders").[4]  Carpenter AR 117; Fields AR 109; Lohmann AR 35; Lopez AR 98; Valdez AR 132; Vaughn AR 112.

The central facts at issue concern what occurred in relation to Plaintiffs' next active duty assignment in FY 2015—specifically, whether the Army originally intended Plaintiffs to have a break in service between their PCS and TCS orders.  The relevant materials reviewed by the Board generally fell into three categories: (1) Plaintiffs' TCS orders, (2) other military records, and (3) Plaintiffs' account of their actions as set forth in legal briefs and the pleadings.

1.    The TCS Orders

Around the same time their PCS orders ended, each Plaintiff received an order issued by the Army's 75th Training Command in Houston, Texas, dated September 25, 2014 ("September 25 Orders").  Carpenter AR 32–33; Fields AR 37–38; Lohmann AR 36; Lopez AR 33–34; Patrick AR 32; Samuel AR 35; Valdez AR 35–36; Vaughn AR 33–34; Williford AR 37.  The orders stated that Plaintiffs were "ordered to Active Duty as a member of your Reserve Component unit" pursuant to 10 U.S.C. § 12302 for a period of 365 days "unless sooner released or unless extended." Carpenter AR 32; Fields AR 37; Lohmann AR 36; Lopez AR 33; Patrick AR 32; Samuel AR 35; Valdez AR 35; Vaughn AR 33; Williford AR 37.  They further instructed Plaintiffs to proceed from their current locations in "sufficient time to report by the date specified," noting Plaintiffs would "enter active duty upon reporting to unit home station."  *Id.*  The orders directed Plaintiffs

---

[4] The Administrative Records for Plaintiffs Samuel and Williford include amended orders extending their active duty end date to September 26, 2014, but do not include orders releasing them from active duty on that date.  Samuel AR 34; Williford AR 34.  The Government, however, does not contest that that their PCS orders ended on September 26.  ECF No. 48 at 8.  Plaintiff Patrick received an order expressly releasing her from active duty effective September 26, 2014, but it is dated September 26, 2014, rather than September 23.  Patrick AR 101.

to report to "0075 TNG CMD Det 2 (W87VY2), 10949 AEROSPACE AVENUE, HOUSTON, TX 77034-000" (the address of the 75th Training Command) on September 26, 2014. *Id.* Notably, September 26 was the same day Plaintiffs were effectively released from their prior PCS orders upon arriving at their HOR. The September 25 Orders further instructed Plaintiffs to then report to "Fort Hood, Building 121, Reception Center, Fort Hood, TX 76544" on September 29, 2014. *Id*. The Government represents (and Plaintiffs do not dispute) that Plaintiffs' unit home station was the 75th Training Command. *See* ECF No. 48 at 9. Most of Plaintiffs' September 25 Orders specifically stated on page two: "You have been ordered to active duty in a TCS status."[5] Carpenter AR 33; Fields AR 38; Lopez AR 34; Valdez AR 36; Vaughn AR 34. And they expressly informed each Plaintiff that "the authorized per diem rate will be 55% [of the local per diem rate]" due to the length of the order (*i.e.*, 181 days or more). *Id.*

A series of subsequent orders issued by both the 75th Training Command and Fort Hood followed. On October 8, 2014, with two exceptions, Plaintiffs received orders from the 75th Training Command amending the September 25 Orders ("October 8 Orders").[6] Carpenter AR 34–35; Fields AR 39–40; Lohmann AR 37–38; Patrick AR 33–34; Samuel AR 36–37; Valdez AR 37; Williford AR 41. The October 8 Orders changed the active duty period to 363 days and indicated that Plaintiffs should report to the 75th Training Command on September 28, 2014. Carpenter AR 34; Fields AR 39; Lohmann AR 37; Patrick AR 33; Samuel AR 36; Valdez AR 37; Williford AR 41. Like the September 25 Orders, most of the October 8 Orders expressly indicated on page two

---

[5] The copies of the September 25 Orders in the Administrative Records for Plaintiffs Lohmann, Patrick, Samuel, and Williford do not include a second page and, thus, do not include this language. Regardless, the Government concedes that all the September 25 Orders were TCS orders because they were issued under the authority of 10 U.S.C. § 12302. *See* ECF No. 48 at 9.

[6] The Administrative Records for Plaintiffs Lopez and Vaughn do not include the October 8 Orders.

that they were TCS orders authorizing per diem at a 55 percent rate.[7] Carpenter AR 35; Fields AR 40; Lohmann AR 38; Patrick AR 34; Samuel AR 37.

On October 30, 2014, Plaintiffs received new orders from Fort Hood, indicating they were assigned to the 75th Training Command and deployed in a TCS status at Fort Hood in support of Operation Enduring Freedom for a period not to exceed 364 days ("October 30 Orders"). Carpenter AR 36–37; Fields AR 41–42; Lohmann AR 40–41; Lopez AR 99–100; Patrick AR 35–36; Samuel AR 40–41; Valdez AR 38–39; Vaughn AR 114–15; Williford AR 38–39. The October 30 Orders instructed Plaintiffs to "proceed on or about" September 27, 2014, presumably to Fort Hood as this was listed as each Plaintiff's "Demob Station" and assignment location. *Id.* Most Plaintiffs also received an amended order on the same date, which added an accounting code to the October 30 Orders.[8] Carpenter AR 38; Fields AR 43; Lohmann AR 39; Lopez AR 35; Patrick AR 37; Valdez AR 40; Vaughn AR 116; Williford AR 40.

Fort Hood further amended Plaintiffs' October 30 Orders on December 1, 2014, to change the "Proceed Date" to September 28, 2014, and the "Days Out" to 363 ("December 1 Orders"). Carpenter AR 39; Fields AR 44; Lohmann AR 42; Lopez AR 36; Patrick AR 103; Samuel AR 42; Valdez AR 41; Vaughn AR 38; Williford AR 104.[9]

---

[7] The copies of the October 8 Orders in the Administrative Records for Plaintiffs Valdez and Williford do not include a second page and, thus, do not include this language.

[8] Plaintiff Samuel's Administrative Record does not include an order dated October 30 adding the accounting code.

[9] For purposes of completeness, the record also includes active duty training orders issued to Plaintiffs Lohmann and Williford, respectively, by the 63rd Regional Support Command in Mountain View, California, dated August 15, 2014. Lohmann AR 33; Williford AR 35. These orders instructed Plaintiffs to report to Fort Hood on September 28, 2014, for three duty days of annual training. *Id.* The Court was unable to locate similar orders for any of the other plaintiffs.

2.    Other Military Records

In addition to Plaintiffs' orders, the Board reviewed other military records, including Plaintiffs' discharge papers as well as leave and earning statements.  With one exception, the record contains Certificates of Release or Discharge from Active Duty ("DD214s") showing that Plaintiffs separated from active duty under their PCS orders on September 26, 2014.  Carpenter AR 120; Fields AR 35; Lohmann AR 110; Lopez AR 32; Patrick AR 102; Samuel AR 107; Vaughn AR 113; Williford AR 100.  For these same plaintiffs, the DD214s show they entered active duty under their FY 2015 TCS orders on September 28, 2014, which is the same date reflected in the December 1 Orders.[10]  Carpenter AR 122; Fields AR 116; Lohmann AR 114; Lopez AR 102; Patrick AR 105; Samuel AR 109; Vaughn AR 119.

Similarly, Plaintiffs submitted Leave and Earning Statements ("LESs") for the month of October 2014, beginning with a period covered by their paychecks dated October 1, 2014. Carpenter AR 95; Fields AR 95; Lohmann AR 96; Lopez AR 91; Patrick AR 93; Samuel AR 92; Valdez AR 114; Vaughn AR 94; Williford AR 91.  These pay records include comments reflecting a "REFRAD [Released from Active Duty]" date of September 26, 2014, for each Plaintiff. Carpenter AR 96; Fields AR 96; Lohmann AR 96; Lopez AR 91; Patrick AR 94; Samuel AR 92; Valdez AR 115; Vaughn AR 95; Williford AR 92.  With one exception, the comments also show that each Plaintiff was on active duty for training beginning on September 28, 2014, through

---

[10] Plaintiff Valdez's Administrative Record contains two DD214s relevant to his FY 2015 claim.  Like the other plaintiffs, the first shows a September 26, 2014, separation date.  Valdez AR 33.  However, that DD214 was subsequently voided because, per a November 2017 memorandum, Plaintiff Valdez was extended on active duty after his DD214 was issued on September 23, 2014. *Id.* at 138–40.  The second DD214 reflects that he did not separate from or begin a new active duty period between April 29, 2013, and September 23, 2017.  *Id.* at 141.

October 15, 2014.[11]  Carpenter AR 103; Fields AR 98; Lohmann AR 99; Lopez AR 94; Patrick AR 95; Samuel AR 95; Valdez AR 116; Vaughn AR 96.  For Plaintiffs Fields, Lohmann, Lopez, Patrick, and Valdez, the LESs further indicate a "MOB [Mobilization]" date of September 28, 2014.  Fields AR 98; Lohmann AR 99; Lopez AR 94; Patrick AR 95; Valdez AR 116.  Based on the Court's review, except for Plaintiff Valdez's reissued DD214, none of Plaintiffs' DD214s or LESs appear on their face to indicate that Plaintiffs were on active duty on September 27, 2014.

    3.    <u>Plaintiffs' Actions</u>

Plaintiffs' account of what they actually did in response to their oft-amended TCS orders is set forth in the legal briefs and the copy of the Complaint attached to each of their applications for correction.  With one exception, all Plaintiffs assert that they returned to their HOR on or before September 26, 2014, in compliance with their PCS orders.  Carpenter AR 7, 137; Fields AR 7, 142; Lohmann AR 7, 127; Lopez AR 7, 123; Samuel AR 7, 129; Valdez AR 7; Vaughn AR 7, 150; Williford AR 7, 129.  Plaintiff Patrick avers that she attempted to return to her HOR on September 26, 2014, but was unable to complete the trip due to illness.  Patrick AR 7, 124.

Plaintiffs further state that after returning home they "subsequently" received their TCS orders and did not report for active duty again until September 28, 2014, or in the case of Plaintiffs Carpenter and Patrick until September 29, 2014.  Carpenter AR 7, 137; Fields AR 7, 142; Lohmann AR 7, 128; Lopez AR 7, 123; Patrick AR 7, 124; Samuel AR 7; Valdez AR 7; Vaughn AR 7, 150; Williford AR 7, 129.  Notably, in contradiction to his legal brief, Plaintiff Samuel alleged in the Complaint that he reported for duty on September 26, 2014.  Samuel AR 129.

---

[11] The dates of active duty for training are not legible in Plaintiff Williford's LESs.  *See* Williford AR 93; *see also* Williford AR 155 (the Board noting the same).  Uniquely, Plaintiff Carpenter's LESs indicate that duty was not performed between September 28 and 30, 2014. Carpenter AR 101.

However, Plaintiffs' characterization of the TCS orders that brought them back to Fort Hood in September 2014 differ from the actual September 25 Orders. Plaintiffs Carpenter and Patrick stated that their September 25 Orders had a report date of September 29, 2014, while Plaintiffs Valdez and Williford stated that their September 25 Orders had a report date of September 28, 2014. Carpenter AR 7, 137; Patrick AR 7, 124; Valdez AR 7; Williford AR 7, 129. Plaintiffs Lohmann and Lopez represented that they received orders dated September 19, 2014, (not September 25) that ordered them back to active duty on September 28, 2014. Lohmann AR 7, 128; Lopez AR 7, 123. And Plaintiffs Samuel and Vaughn asserted contradictory characterizations of their TCS orders. *Compare* Samuel AR 7 (stating that September 25 Order included report date of September 28), *with id.* at 130 (alleging that September 25 Order included report date of September 26); *Compare* Vaughn AR 7 (stating that September 25 Order included report date of September 28), *with id.* at 150 (alleging he received an order dated September 19, 2014, (not September 25) including a report date of September 28). The record also includes other inconsistencies. *See, e.g.*, Fields AR 7, 142 (release date of September 23, as opposed to September 26); Samuel AR 129 (release date of September 24, as opposed to September 26).

Moreover, neither Plaintiffs' legal briefs nor the Complaint submitted with their applications explain why Plaintiffs did not report to the 75th Training Command for active duty on September 26, 2014, as their actual September 25 Orders instructed. The record also does not contain any information about communications Plaintiffs may have had with their commanders prior to receiving their orders, which could shed light on the original intent, or any explanation for why they believed the September 25 Orders were erroneous.[12]

---

[12] The Complaint filed in this action included as an exhibit a sworn statement from Plaintiff Valdez dated May 22, 2018. *See* Pls.' Compl., Ex. 1. at 2, ECF No. 38-1 (public version). In this

C.      **Procedural History**

After attempting for several years to press their claims for per diem reimbursement both within and outside the Army, Plaintiffs filed the instant action on July 11, 2019, on behalf of themselves and a proposed class of similarly situated RC soldiers.  Plaintiffs' Complaint alleged that the Army's denial of per diem payments violated 37 U.S.C. § 474(a)(4) and the JTR, *see* Pls.' Compl. ¶¶ 27, 185–97, ECF No. 1, and sought back pay for the per diem entitlements the Army allegedly owes, *see id.* at 28 ("Prayer for Relief").  The Complaint asserted these claims with respect to the Army's denial of per diem related not only to Plaintiffs' FY 2015 orders, but also their orders for FYs 2016 and 2017.

On July 18, 2019, one week after initiating this suit, the Principal Deputy Assistant Secretary of the Army for Manpower and Reserve Affairs ("PDASA") sent a letter to Plaintiffs' counsel responding to counsel's March 2018 letter requesting per diem payments.  *See, e.g.*, Carpenter AR 91 (Letter from Marshall M. Williams to Michael E. Silverman (July 18, 2019)).  After reviewing the materials submitted by Plaintiffs, the PDASA determined that Plaintiffs are not authorized per diem entitlements for their active duty period in FY 2015.  *Id.*  He noted that Plaintiffs were released from their PCS orders and on the same day ordered back to active duty on TCS orders, which were retroactively amended several weeks later to create a two-day break in service.  *Id.*  He also noted that the JTR prohibits changing a permanent duty station once travel is complete and prohibits retroactively modifying orders to create or change an allowance, such as

---

statement, Plaintiff Valdez explained that he was part of the leadership team involved in bringing RC soldiers back to Fort Hood on the FY 2015 TCS Orders.  He provided some explanation of what was anticipated for the orders, what was communicated to the RC soldiers, the "error" with the initial orders, and the subsequent "corrected" orders.  *Id.*  Plaintiffs did not submit this statement as part of their applications to the Board, and thus it is not part of the Administrative Records that form the basis of this Court's review.  *See Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006).

per diem. *Id.* Since Plaintiffs were already residing at Fort Hood on PCS orders and did not have an "actual [break in service]" between their PCS and TCS orders, the PDASA concluded they are not entitled to per diem for FY 2015. *Id.* Additionally, he found that the retroactive amendment of Plaintiffs' TCS orders to create an entitlement was contrary to the JTR. *Id.* However, because Plaintiffs' TCS orders for FYs 2016 and 2017 did demonstrate the requisite break in service, the PDASA concluded Plaintiffs are entitled per diem allowances for those periods. *Id.* at 92.

On March 9, 2020, the Government moved pursuant to Rule 52.2(a) of the Rules of the United States Court of Federal Claims ("RCFC") for an order remanding this matter to the Secretary of the Army with instructions to submit Plaintiffs' claims to the ABCMR and staying further proceedings pending the remand decisions. *See* Def.'s Mot. for Voluntary Remand and a Stay of Ct. Proceedings at 1, ECF No. 12. The Government argued that the "interests of efficiency and justice" weighed in favor of giving the Army the opportunity to address Plaintiffs' claims in the first instance. *Id.* at 3. Over Plaintiffs' objection, on March 26, 2020, the Court entered an order staying proceedings, including Plaintiffs' then-pending motion for class certification, and remanding the case to the ABCMR. *See* Order (Smith, J.), ECF No. 16. Among other things, the Court noted that potential class members would not be prejudiced by a remand because, in the event the ABCMR provided complete or partial relief to Plaintiffs, the Government committed to notifying similarly situated Army soldiers that they might be entitled to compensation. *Id.* at 2 (quoting ECF No. 12 at 5).

In November 2020, the ABCMR issued decisions in Plaintiffs' remand proceedings. *See* Joint Status Report, ECF No. 22. In each case, the Board agreed with the PDASA's determination that Plaintiffs are not entitled to per diem payments for FY 2015 but are entitled to per diem payments for FYs 2016 and 2017. *See, e.g.*, Carpenter AR 179–80. The ABCMR found "the start

date of the orders for [FY] 2015 failed to create a break in service relative to [Plaintiffs'] orders that covered [FY] 2014," and thus they did not meet the JTR's break-in-service requirement.  *Id.* at 179.  It found that, "[u]pon denial of [Plaintiffs'] payments," the FY 2015 TCS orders "were retroactively amended to create a false break in service," which "was clearly undertaken to 'create a change in allowance.'"  *Id.*  The Board described the retroactive amendment as "extraordinary" and found that it violated the JTR's prohibition on retroactive revocation and/or modification of orders.  *Id.* at 180.  Accordingly, the Board recommended denial of Plaintiffs' applications as to their FY 2015 claims and recommended correction of Plaintiffs' military records to reflect their entitlement to per diem for FYs 2016 and 2017.  *Id.* at 181.

Following the ABCMR's remand decisions, Plaintiffs filed an Amended Motion for Class Certification and Appointment of Class Counsel, renewing their request that the Court certify the proposed class.  *See* Pls.' Am. Mot. for Class Certification & Appointment of Class Counsel, ECF No. 27.  After conducting a hearing, the Court denied Plaintiffs' motion on June 29, 2021, holding that Plaintiffs' FYs 2016 and 2017 claims (and any class action with respect to those claims) were moot and that their FY 2015 claims did not meet RCFC 23's requirements for class certification.  *See* Order Den. Class Certification at 21, ECF No. 39.  Accordingly, the issues remaining in this case relate only to the FY 2015 per diem payments sought by individually named plaintiffs.

Following the Court's decision, Plaintiffs amended their Complaint.  *See* Pls.' First Am. Compl., ECF No. 44.  In their First Amended Complaint, Plaintiffs dismissed the claims of Plaintiff LTC Joe Duckworth and added SGM Lucio Valdez as a plaintiff.  *See id.* at 1.  On September 16, 2021, Plaintiffs moved for judgment on the Administrative Record.[13]  *See* ECF No.

---

[13] This action includes one other plaintiff, LTC Mario Villegas.  The Board's decision on remand afforded Plaintiff Villegas complete relief on his claims.  Because he did not serve on TCS orders in FY 2015, he is not a party to Plaintiffs' motion.  *See* ECF No. 46 at 8 n.4.

46.   They argue that the Board's decisions were arbitrary and capricious because the Board disregarded the fact that Plaintiffs had an actual one-day break in service, as shown by the evidence before the Board, and failed to consider whether the TCS orders were amended to reflect the original intent (*i.e.*, what actually occurred).  *Id.* at 27.  The Government cross-moved for judgment on October 28, 2021, arguing that the Board's decisions were supported by substantial evidence and neither arbitrary nor capricious.  *See* ECF No. 48.  The Court held oral argument on April 14, 2022.

## II.  LEGAL STANDARDS

### A.      Judgment on the Administrative Record

RCFC 52.1 permits parties to file a motion for judgment on the administrative record, which is "properly understood as . . . an expedited trial on the record."  *Bannum v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005).  In contrast to the standard for summary judgment, "the standard for judgment on the administrative record is narrower" and involves determining, "given all the disputed and undisputed facts in the administrative record, whether the plaintiff has met the burden of proof to show that the decision was not in accordance with the law."  *Martinez v. United States*, 77 Fed. Cl. 318, 324 (2007) (citing *Bannum*, 404 F.3d at 1357).  Therefore, a genuine issue of disputed fact does not prevent the Court from granting a motion for judgment on the administrative record.  *See Bannum*, 404 F.3d at 1357.

### B.      Review of Decisions of Boards for Correction of Military Records

The Court reviews the decision of a military correction board under a deferential standard and will not "disturb the decision . . . unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence."  *Barnick v. United States*, 591 F.3d 1372, 1377 (Fed. Cir. 2010) (citing *Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005)).  The Court may

find that a correction board's decision was arbitrary and capricious "if the board entirely fails to consider an important aspect of a problem, offers an explanation for its decision that runs counter to the evidence before the board, or is so implausible that it could not be ascribed to a difference in view or the product of board expertise." *Van Cleave v. United States*, 66 Fed. Cl. 133, 136 (2005). Under the substantial evidence standard, the Court must determine whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support [the board's] conclusion." *Strand v. United States*, 951 F.3d 1347, 1351 (Fed. Cir. 2020) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). Such review, however, should not involve reweighing the evidence. *Id.*

The Court's review in a military pay case is limited to the administrative record. *Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006). To prevail, the record must contain evidence of legal error or deficiency in the decision-making process, meriting judicial relief and "overcom[ing] the strong, but rebuttable, presumption that the administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Doe v. United States*, 132 F.3d 1430, 1434 (Fed. Cir. 1997) (quoting *Sanders v. United States*, 594 F.2d 804, 813 (Ct. Cl. 1979)). Plaintiffs' burden is to show by "cogent and clearly convincing evidence" that the decision of the correction board fails this standard. *Wronke v. Marsh*, 787 F.2d 1569, 1576 (Fed. Cir. 1986). Where a correction board has failed to examine relevant data or articulate a reasoned explanation for its decision, including making rational connections between the facts at issue and its decision, a remand is appropriate. *Rominger v. United States*, 72 Fed. Cl. 268, 273 (2006) (citing *Van Cleave*, 66 Fed. Cl. at 136); *see* RCFC 52.2(e).

## III.  DISCUSSION

### A.    Jurisdiction

The parties do not dispute the Court's jurisdiction over Plaintiffs' claims.  It is well established that the Military Pay Act is a money-mandating statute and that claims for back pay based on the Act are within the jurisdiction of the Court of Federal Claims.  *See Metz*, 466 F.3d at 998; *see also Dysart v. United States*, 369 F.3d 1303, 1315 (Fed. Cir. 2004).  Indeed, like the Act's basic pay provision, 37 U.S.C. § 204, the provision invoked by Plaintiffs—§ 474—entitles uniformed service members to certain travel and transportation allowances when away from home to perform duty for which they are entitled to pay under Title 37.  *See* 37 U.S.C. § 474(a)(4).  Plaintiffs' claims thus fall comfortably within the Court's Tucker Act jurisdiction.  *See Miglionico v. United States*, 108 Fed. Cl. 512, 520 (2012).

### B.    The ABCMR's Decisions Were Both Arbitrary and Capricious and Unsupported by Substantial Evidence.

There are two fatal deficiencies with the ABCMR's decisions.  First, the Board failed to consider an important aspect of Plaintiffs' claims—*i.e.*, whether their initial FY 2015 TCS orders were retroactively amended to reflect the original intent.  And, even if the Court infers that the Board impliedly rejected Plaintiffs' original intent argument, the Board failed to adequately articulate the basis of that conclusion.  Second, the Board's "false break in service" finding was unnsupported by substantial evidence in the factual record.

### 1.    The Board Failed to Address Plaintiffs' Original Intent Argument and Did Not Adequately Explain Its Decisions.

Plaintiffs argue that the ABCMR failed to consider whether the amendments to their TCS orders were issued "to comport with the intent of their initial orders and the reality of what had occurred" between their PCS and TCS orders.  ECF No. 46 at 30.  Plaintiffs claim the Board

disregarded evidence showing they each had an actual one-day break in service, even though the initial orders did not provide one. *Id.* at 27, 29–30. They contend the Board, instead, minimally scrutinized their claims and merely parroted the conclusions in the PDASA's 2019 letter. *Id.* at 30 & n.8. The Government, on the other hand, argues that the ABCMR did not disregard or ignore Plaintiffs' evidence, as each decision summarized the evidence before the Board and stated that "[t]he Board considered the arguments of the applicant's counsel and all evidence of record." ECF No. 48 at 14 (quoting Carpenter AR 179). It also contends the Board made a finding on original intent because the decisions referenced the applicable JTR provisions, *id.* (citing Carpenter AR 191), and concluded that Plaintiffs' FY 2015 TCS orders "were retroactively amended to create a false break in service," *id.* (quoting Carpenter AR 180).

The import of the original intent argument to Plaintiffs' claims is clear. It is undisputed that the JTF allows retroactive amendment of orders—even if it creates, denies, or changes an allowance—so long as the amendment "correct[s]/complete[s] an order to show the original intent." JTR, ch. 4, pt. J, § 4950.A.4; *see id.*, ch. 2, pt. C, § 2205.A.1. Plaintiffs arued in their applications to the Board that this exception applied. Specifically, they claimed the September 25 Orders were "amended to correct an administrative error" regarding their active duty start date and "to reflect the actual intent of the orders" consistent with what occurred in the real world. *E.g.*, Carpenter AR 9. A review of Plaintiffs' PCS and FY 2015 TCS orders provides some support for their allegation of error. Specifically, Plaintiffs' orders effectively released them from active duty under their PCS orders on September 26, 2014, and ordered them to active duty under their initial TCS orders on the exact same date. In the meanwhile, Plaintiffs' PCS orders directed them, upon completion of duty, to return to their homes and "upon arrival be released from active duty." *Id.* at 115. Plaintiffs argue it would not be possible to comply with both sets of orders because some

16

plaintiffs lived up to 600 miles from their unit home station in Houston, the location to which their initial TCS orders directed them to report.  ECF No. 46 at 28; *see id.* at 28 n.6 (arguing that a service member cannot end and begin two active duty assignments on the same day).  They also emphasize the timing of the initial TCS orders, which were issued while Plaintiffs were en route to their homes per the original PCS orders and September 23 release orders (or, in the case of Plaintiff Patrick, her September 26 release order).  There is some intuitive force to Plaintiffs' arguments.

Yet, the Board's analysis never addressed whether Plaintiffs' initial TCS orders contained an error, what the original intent was with respect to the orders, or whether the amendments sought to correct the orders to show that intent.  Indeed, it did not discuss Plaintiffs' original intent argument, or the "best evidence" of Plaintiffs' break in service (the LESs), at all.  *See, e.g.*, Carpenter AR 179–80.  Rather, the Board focused on the rule, not the exception, finding the amendments created a "false break in service . . . undertaken to 'create [a] change in allowance.'" *Id.*  And although the Board also concurred with the PDASA's rationale for denying Plaintiffs' claims, it is equally clear that the PDASA's letter did not address Plaintiffs' original intent argument either.  *See id.* at 154.

The curtness and narrow focus of the Board's discussion is out of step with the analysis applied in the Comptroller General Opinion specifically cited in JTR § 4950.A.4.  This opinion acknowledged that, although exceptional, retroactive modification of a travel order may be permitted "where travel orders, on their face, would be incomplete or ambiguous or where . . . some provision previously determined and otherwise authorized and definitely intended in a particular case had been omitted through error or inadvertence in preparing the travel order."  24 Comp. Gen. 439, 441–42 (Dec. 9, 1944).  The cited opinion also made clear that application of the

exception was dependent on the "particular facts and circumstances involved in each case." *Id.* at 442. The Board's analysis of Plaintiffs' FY 2015 claims does not evince any consideration of the questions raised by the original intent exception to the rule prohibiting retroactive amendments or the "particular facts and circumstances" presented in Plaintiffs' applications. This deficiency is particularly concerning given that the Board relied primarily on the start date in the initial TCS orders to find an absence of a break in service, even though Plaintiffs' applications specifically alleged those orders contained an erroneous start date. In short, the initial TCS orders themselves could not be the lone bulwark of evidence upon which the Board based its determination without any discussion of the other relevant facts and circumstances raised by Plaintiffs.

The Government's defense of the Board's decisions is unpersuasive. It is true that the Board noted the original intent exception in the 13-page "References" section of each decision. *See, e.g.*, Carpenter AR 191, 194. It would be a significant oversight not to include it, since the exception language is part of the very same JTR provisions stating the rule against retroactive amendments. But that does not change the fact that the Board's discussion failed to address whether the facts and circumstances raised by Plaintiffs warranted application of the exception in their cases.

It also is possible, as the Government suggests, to construe the Board's finding of a "false break in service" as an implied rejection of Plaintiffs' original intent argument. To do so, however, one must assume the Board used the term "false" to mean it disbelieved that Plaintiffs returned or attempted to return to their HOR before reporting for active duty at Fort Hood two days later.[14] In

---

[14] When asked at oral argument how the Court should interpret the phrase "false break in service," the Government contended that "the Board wasn't deciding whether there was, in fact, a break in service" but rather whether the original intent was something other than what the initial TCS orders stated. Hr'g Tr. at 38:17–39:1, ECF No. 58. That characterization is not necessarily

that case, the decisions failed to adequately articulate a basis for that conclusion. *See Van Cleave*, 66 Fed. Cl. at 136 (correction boards "must examine relevant data and articulate satisfactory explanations for their decisions, includ[ing] making rational connections between the facts found and the choices made" (internal citations omitted)). Plaintiffs contend that the evidence before the Board "conclusively" showed they had a one-day break in service between their PCS and TCS orders. ECF No. 46 at 27. They point to evidence in the record, including their LESs and DD214s, as well as the allegations in the Complaint (also submitted to the Board) to support their position about what actually occurred and what the Army intended to occur in the period between the two sets of orders. *Id.* at 27, 29.

It is clear the Board was aware of and reviewed Plaintiffs' supporting documents, as it summarized those materials at length in each decision. *See, e.g.*, Carpenter AR 166–79. But how the Board weighed the evidence and what it found to be probative or not probative is entirely unexplained in its analysis. Indeed, the discussion section did not mention any of this specific evidence at all. It only stated in conclusory fashion that the Board found Plaintiffs "failed to demonstrate by a preponderance of evidence" that the denial of their FY 2015 claim was erroneous. *Id.* at 180. For this Court to meaningfully review that conclusion, the Board must explain *why* Plaintiffs failed to meet their burden. Otherwise, the Court cannot determine whether, as the Government argues (ECF No. 48 at 18), Plaintiffs assert a mere disagreement with the Board's weighing of the evidence or whether they present convincing evidence that the Board's decision must be set aside. *See Peoples v. United States*, 87 Fed. Cl. 553, 577 (2009) (citing *Smith v. United*

---

borne out in the decisions and does not comport with the plain meaning of "false." *See False*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining false as "untrue" and "deceitful; lying"). Regardless, Plaintiffs' allegations regarding an actual break in service are part and parcel of their original intent argument and thus cannot simply be ignored.

*States*, 168 Ct. Cl. 545, 552 (1964) (setting aside a correction board decision where it was impossible to "determine[] what weight was given to the evidence")).

In response, the Government largely offers explanations that cannot be found in the decisions themselves. It argues that Plaintiffs' DD214s are not probative of the original intent of the initial FY 2015 TCS orders because they are based on the orders *as amended*. *See* ECF No. 48 at 16. According to the Government, the LESs merely show the dates Plaintiffs performed active duty for training, not the dates they reported for active duty under the TCS orders or the original intent of those orders. *Id.* at 17. It also contends that the ABCMR's decisions "indicate[] that it found that the start date of the orders for fiscal year 2015 was more probative of the original intent of the initial orders [than the LESs, DD214s, and Plaintiffs' representations]." *Id.* But the Board did not state as much on any of these points, and neither the Government nor the Court can "supply a reasoned basis for [an] agency's action that the agency itself has not given." *Petri v. United States*, 104 Fed. Cl. 537, 550 (2012) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)); *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency."). Without an explanation by the Board of its findings as to Plaintiffs' evidence, this Court cannot effectively review the decisions. *Rominger*, 72 Fed. Cl. at 273. This is especially true where the evidence underlying Plaintiffs' original intent argument raised questions of fact: for example, whether Plaintiffs demonstrated (a) that their TCS orders contained an erroneous start date, (b) that they were not on duty or not paid for duty time on September 27, 2014, or (c) even assuming a break actually occurred, that the Army intended Plaintiffs to have a break in service notwithstanding the start date in their initial TCS orders. These questions should have been answered by the Board in the first instance.

By not addressing Plaintiffs' original intent argument or the evidence supporting their claims, the Board arbitrarily and capriciously ignored an important aspect of the issue before it and failed to adequately explain its decisions.

2.  <u>The ABCMR's Decisions Are Not Supported by Substantial Evidence.</u>

Notwithstanding the deficiencies discussed above, the ABCMR's decisions did assert two bases for its conclusion that the retroactive amendment of Plaintiffs' FY 2015 TCS orders created a false break in service clearly undertaken to create a change in allowance.  First, the Board noted that the orders were retroactively amended "[u]pon denial of the applicant's [per diem] payments." *E.g.*, Carpenter AR 180.  Second, it found the retroactive amendments "indicative of the 'TCS (Temporary Change of Station) Culture' identified and discussed by the U.S. Army Audit Agency in its 2015 report." *Id.*  Neither of these findings provide substantial evidence for its conclusion.

First, there is no evidence in the record to support the Board's statement that the amendments at issue were made "upon denial" of Plaintiffs' requests for per diem payments.  The only materials before the Board that referred to the timing of Plaintiffs' requests and the Army's denials were Plaintiffs' briefs in support of their applications and the Complaint.  In these documents, Plaintiffs represented that they submitted their requests for per diem in October 2015, approximately a year after the first amendment to their initial TCS orders, and that the Army denied those requests.  Carpenter AR 7, 137; Fields AR 7, 142; Lohmann AR 7, 128; Lopez AR 7, 123; Patrick AR 7, 125; Samuel AR 7, 130; Valdez AR 7; Vaughn AR 7, 150; Williford AR 7, 130.  The Government does not refute Plaintiffs' history of events, contending instead that Plaintiffs requested per diem payments between "September 26, 2014, and October 29, 2015."  ECF No. 48 at 10 (citing ECF No. 1 ¶¶ 8–13).  The ABCMR's decisions did not refer to any evidence to support its assertion about the timing of amendments, nor can the Court locate any evidence in the record

showing the amendments were issued *only after* Plaintiffs sought and were denied per diem payments.

Second, the 2015 audit report cited by the Board does not pertain directly to Plaintiffs.  The Government does not dispute that fact.  *See* Hr'g Tr. at 37:23–25, ECF No. 58.  Instead, it argues that the audit report findings supported the Board's "false break in service" determination because the report shows "that Reserve units created a 'culture' of creating and retroactively amending orders to create entitlements."  ECF No. 48 at 17 (quoting Carpenter AR 180).  That is not exactly accurate.  As the Court explained in its order denying class certification, the 2015 audit report "does not clearly refer to the same type of order modification at issue in this case."  ECF No. 39 at 27.  The report found a significant number of RC soldiers who received per diem had their PCS orders amended to end early so they could begin a TCS order.  *See, e.g.*, Carpenter AR 62. Specifically, the report provided one example of a soldier who served on a PCS order for only a few months, who then received amended PCS orders ending his active duty nine months sooner than originally planned.  *Id.* at 68–69.  The soldier then began a TCS order at the same location after a two-day break in service.  *Id.*  This example does not appear to involve a retroactive modification of TCS orders, as is the case here.  *See* ECF No. 39 at 27.  Nor did the report discuss any examples of RC soldiers receiving TCS orders that were retroactively changed to support per diem allowances or examples of TCS entitlements being based on false breaks in service.

What the 2015 audit report did find, however, was a demonstrated pattern of RC soldiers receiving TCS entitlements without any break in service between their PCS and TCS orders.  *See, e.g.*, Carpenter AR 61.  It also noted that unit commanders began making sure soldiers received the requisite break in service so that they would qualify for TCS entitlements, by for example issuing a TCS follow-on order before the end of the PCS order or amending the PCS order to end

early and issuing a TCS order a few days later. *Id.* at 68. As reflected in the report, the Army clearly disfavored this practice. But although the report emphasized that a one-day break in service between orders was not in compliance with the "intent" of the JTR, it nonetheless found it was in accord with its "strict wording." *Id.* at 66. The Court agrees with the Government that the report may provide some "color" as to what was happening at Fort Hood at the time, but it does not provide substantial support for the conclusion that Plaintiffs' TCS orders were amended to create a false break in service for the purpose of supporting an entitlement. At the very least, the Board put an outsized emphasis on the 2015 audit report's findings.

Because the first basis of the Board's determination is not supported in the record and the second basis does not relate directly to Plaintiffs or the pertinent issue in this case, the Court finds that the Board's "false break in service" finding is not supported by substantial evidence.

*     *     *

In sum, the ABCMR's decisions cannot be sustained. The Board did not determine, consistent with JTR § 4950.A.4, whether the Army's original intent was for Plaintiffs to return to Fort Hood on September 28, 2014, as the subsequent amendments to their TCS orders ultimately indicated. It thus failed to address an important aspect of Plaintiffs' claim and to provide a reasoned explanation of its decision. Moreover, its determination that Plaintiffs' amended orders provided a "false break in service" to support a per diem allowance was not supported by substantial evidence. Because the Board's decisions are inadequately explained and because the Board failed to make necessary factual findings on the issue of original intent, the Court cannot say that Plaintiffs are entitled to FY 2015 per diem payments as a matter of law on the basis of the record before it. Rather, a remand to the Board for it to issue new decisions is appropriate. *See Rominger*, 72 Fed. Cl. at 273 (citing *Van Cleave*, 66 Fed. Cl. at 136); *Peoples*, 87 Fed. Cl. at 580

(holding that a decision lacking an adequate rationale should be remanded "to make findings of fact showing the basis for [the board's] conclusions").

## IV.  CONCLUSION

For the reasons set forth above, Plaintiffs' motion (ECF No. 46) is **GRANTED IN PART**, and the Government's motion (ECF No. 48) is **DENIED**.  The matter is **REMANDED** to the ABCMR for a proper evaluation of Plaintiffs' FY 2015 claim consistent with this opinion.

Pursuant to RCFC 52.2(b), the Court provides the following directions to the parties on remand:

1. The ABCMR shall:

    a. Directly address Plaintiffs' original intent argument and make all necessary factual findings to support its conclusions, to include determining based on all the facts and circumstances:

        i.  whether Plaintiffs have demonstrated by a preponderance of evidence that the September 25 Orders contained an erroneous report date and/or report location;

        ii.  whether Plaintiffs have demonstrated by a preponderance of evidence that they returned or attempted to return to their homes upon receiving an order releasing them from active duty under their PCS orders and before reporting for active duty under their FY 2015 TCS orders;

        iii.  whether Plaintiffs have demonstrated by a preponderance of evidence that they were not in an active duty status on September 27, 2014, as shown by, for example, their DD214s and LESs;

        iv.  whether Plaintiffs have demonstrated by a preponderance of evidence that their September 25 Orders were modified retroactively to correct/complete the orders to show the original intent; and

        v.  any other facts necessary to support the Board's decisions;

    b. Determine based on a proper and complete evaluation of the record, consistent with this opinion, whether Plaintiffs are entitled to per diem payments relative to their FY 2015 TCS orders; and.

    c. Ensure that its written decisions articulate the reasons for its judgment with sufficient detail.

2.   The remand period shall terminate in 90 days on **October 17, 2022**.

3.   Proceedings in this case <u>will not</u> be stayed pending the remand, and the Court intends to address Plaintiffs' Motion for Reconsideration of Order Denying Class Certification (ECF No. 60) once it is fully briefed.

4.   The Government shall file a status report on or before **September 2, 2022**, indicating the status of the matter on remand.

5.   The Government shall notify the Court and Plaintiffs of the final decisions of the ABCMR within **14 days** of the issuance of the decisions.

6.   Within **30 days** of the filing of the ABCMR's decisions, the parties shall file the notices required by RCFC 52.2(e)(1).

The Clerk's office shall serve a copy of this Order on the ABCMR at:

Army Board for Correction of Military Records
251 18th Street South
Suite 385
Arlington, VA 22202-3531

**SO ORDERED**.


Dated: July 19, 2022                              */s/ Kathryn C. Davis*
                                                 KATHRYN C. DAVIS
                                                 Judge